UNITED STATES of America, Appellee,

v.

Felipe BERNAL, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Maria JIMENEZ–SANCHEZ,
Defendant, Appellant.

United States Court of Appeals,
First Circuit.

Heard March 2, 1989.

Decided Sept. 14, 1989.

Albert C. Bielitz, Jr., Cambridge, Mass., by Appointment of the Court, for appellant Felipe Bernal.

Luis A. Medina Torres, Hato Rey, P.R., by Appointment of the Court, for appellant Maria Jimenez–Sanchez.

Salixto Medina–Malave, Asst. U.S. Atty., Santurce, P.R., Crim. Div., with whom Daniel F. Lopez–Romó, U.S. Atty., Hato Rey, P.R., was on brief for the U.S.

Before TORRUELLA and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

This consolidated appeal arises out of a "sting" operation conducted by Puerto Rico police and U.S. Drug Enforcement Administration ("DEA") agents which led to the arrest and indictment of four defendants on three counts each: conspiracy to possess with intent to distribute cocaine, aiding and abetting the possession with intent to distribute cocaine, and distributing a controlled substance, all in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2. Two defendants pled guilty to one count each and were sentenced to ten and twelve year terms of imprisonment respectively.

Defendant-appellant Felipe Bernal pled guilty to all three counts and received three ten-year consecutive terms. Defendant-appellant Maria Jimenez–Sanchez proceeded to trial and the jury found her guilty on two of the three counts. She was later sentenced to a ten-year concurrent term on each count.

Appellant Bernal, who is 62, now appeals his 30–year sentence as unconstitutional cruel and unusual punishment and claims that his plea was not knowingly and willingly entered because he believed that two of the counts would be merged before sentencing. Appellant Sanchez challenges the sufficiency of the evidence presented at her trial, the district court's finding, under *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977), that permitted her co-conspirators' statements to be admitted at trial, and the admissibility of a government videotape of the meeting between DEA agents and the four defendants, including Sanchez. In all respects regarding the issues above, we affirm.

### I. *Background*

The sting operation began when DEA undercover agents in Colombia received the address and telephone number of two women in Puerto Rico who could arrange a cocaine purchase. The agents contacted the two women who agreed to set up a meeting and introduce them to appellant Bernal, who they described as the "owner" of the cocaine. After some negotiating, the agents eventually met the two women at the Caribe Hilton Hotel pool bar in San Juan and were introduced to Bernal. At this meeting, Bernal was accompanied by appellant Sanchez, who he introduced as his wife. Bernal, Sanchez, the two women and the two agents proceeded to a room in the hotel previously secured by the DEA, where agent Morales discussed the price and amount of cocaine he wished to purchase from Bernal ($180,000 for ten kilos) and "flashed" some cash. DEA agents videotaped this meeting from the room next door. Morales and Bernal agreed to complete the transaction the following day.

* Of the District of Massachusetts, sitting by designation.

Agents and police monitored Bernal's and Sanchez's activities from the time they left the hotel room until their arrest the next day. Bernal and Sanchez went to Sanchez's residence after the meeting at the Hotel. The following morning, the couple went shopping together and Bernal made several telephone calls to Morales in order to finalize the cocaine deal. Bernal and Sanchez eventually returned to Sanchez's house and agents observed Bernal leaving the residence with two white and purple shopping bags. Bernal arrived at Morales' room at the Caribe Hilton carrying the same shopping bags. Each bag contained five blocks of cocaine. After his arrest, Bernal consented to a search of his locked room at Sanchez's house, where police found six more packages of cocaine. Later testing established that the seized cocaine was 88% pure and weighed a total of 15.67 kilograms, or 34.47 pounds.

## II. *Bernal's Sentence*

When reviewing a criminal sentence imposed by the trial court, the standard is high:

> In challenging their sentences, the appellants bear a very heavy burden, since the trial court has very broad discretion in sentencing ... Indeed, the general rule is that when the sentence is within statutory limits, it is not subject to review by an appellate court.

*United States v. Jimenez–Rivera,* 842 F.2d 545, 548 (1st Cir.) (citing *Wasman v. United States,* 468 U.S. 559, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984), *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591–592, 30 L.Ed.2d 592 (1972); and *United States v. Pasarell,* 727 F.2d 13, 17 (1st Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984)), *cert. denied,* — U.S. ——, 108 S.Ct. 2882, 101 L.Ed.2d 917 (1988). We have recognized a "narrow exception" to this general rule, however, and "will overturn a sentence where the facts indicate that the court below adopted a rigid, mechanistic approach to sentencing, and failed to consider the individual mitigating circumstances of each defendant." *Jimenez–Rivera,* 842 F.2d at 548 (citing

*United States v. Wardlaw,* 576 F.2d 932, 938 (1st Cir.1978)).

As a threshold matter, we note that the district court sentenced Bernal to the statutory minimum. Section 841(b)(1)(A) provides that, in the case of violations involving a schedule II controlled substance such as cocaine, *see* 21 U.S.C. § 812(c), "such person shall be sentenced to a term of imprisonment which may not be less than 10 years...." 21 U.S.C. § 841(b)(1)(A). Bernal's sentence is, therefore, properly within the applicable statutory limits.

Bernal argues, however, that because he is 62 years old, his 30–year sentence is, in effect, a death sentence. He argues that this was his first known offense in the United States and this, in combination with his age, unspecified health problems, and his belief that his co-conspirators received lighter sentences, leads to Bernal's assertion that his sentence constitutes cruel and unusual punishment. We find no merit in these arguments. As to Bernal's argument that this was his first offense, we can do no better than to repeat the district court's words at the sentencing hearing:

> [I]t is impossible for me to understand that if the defendant says this is the first time that he was involved in drugs how could it be that he had 17 kilos of cocaine 90 percent pure? That is inconceivable because you don't have access to that amount of drugs unless you have been dealing in drugs for quite a number of years.

Transcript of Proceedings, Feb. 4, 1988, at 6. As to his co-conspirators' sentences, we note that the three other defendants were sentenced to comparable terms on each applicable count in the indictment. The fact that Bernal's cumulative term is longer than that received by his co-conspirators does not provide a basis for overturning the sentence. *Gregory v. United States,* 585 F.2d 548, 550 (1st Cir.1978). And finally, in response to Bernal's argument that his sentence constitutes cruel and unusual punishment because of his age and health, we travel a well-worn path. The sentencing court must

grant "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes ..." Congress has made the determination that persons possessing that quantity of the drug constitute major traffickers and managers of the retail level traffic ... and imposed the minimum mandatory penalty as a deterrent to such activities ... In light of the severity of the crime and drug-related problems in today's society, the penalty is not so high as to be unconstitutional.

*United States v. Restrepo,* 676 F.Supp. 368, 377 (D.Mass.1987) (quoting *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009–3010, 77 L.Ed.2d 637 (1983); other citations omitted), *aff'd,* 867 F.2d 605 (1st Cir.1988). Congress established the 10–year minimum term for violations of 21 U.S.C. § 841(a)(1). The district court properly determined that Bernal was a major trafficker in cocaine. In choosing the minimum mandatory sentence, rather than an even harsher sentence permitted by law, the court apparently *did* consider the individual mitigating factors of Bernal's age and health and did not sentence him in an impermissibly rigid, mechanistic manner. *Jimenez–Rivera,* 842 F.2d at 548.

■ Bernal also argues that his guilty plea was not knowingly and voluntarily made because he believed two counts would merge. This assertion is flatly contradicted by the record. Unlike two of the defendants, Bernal made no plea agreement with the government. At the initial sentencing hearing, during the colloquy, the court asked the following questions, which Bernal and his attorney answered:

Q: Now, you have filed [sic] out a form here in petition to enter a guilty plea, is that correct?

A: Yes.

Q: Have you had enough time to consult with your attorney about this matter?

A: Yes ...

Q: And to which count are you going to plea[d] guilty?

Mr. Amoros: To three counts ...

The Court: Do you know what you have been charged before this court?

A [Mr. Bernal]: Yes, yes.

Q: If you have any doubt about that, I can read the charges for you, if you want me to.

A: No, that is not necessary.

Transcript, Change of Plea, Dec. 14, 1987, at 3–4. The court later asked:

Q: Do you know what the [m]aximum possible penalty in count one is?

A: Yes, sir.

Q: Do you know what the maximum possible penalty in count two is?

A: Yes, sir.

Q: And do you know what the maximum possible penalty in count three is?

A: Yes, I do.

Q: What is your understanding of what the maximum penalty is[?]

A: Life imprisonment.

Q: *As to each count?*

A: Yes, sir.

Transcript, Change of Plea, at 7 (emphasis added). And finally, the court explained:

Q: All right, *since you are pleading guilty to three counts,* any sentence that I impose on each count can be imposed consecutively [or] concurrently to each other ... If I were to sentence you concurrently, each of those sentences would be served at the same time ... If I were to sentence you consecutively instead of being twenty years total, for example, it would be twenty plus twenty plus twenty, which would be sixty years, and the same thing with the fine, each amount on each count would be added on to each other ... You understand the difference between a concurrent and a consecutive sentence?

A: Yes, I do understand, sir.

Transcript, Change of Plea, at 8–9 (emphasis added). At no point in the colloquy did the court mention merger of any of the counts. During the hearing the court discussed all three counts in detail, determined that Bernal wished to plead guilty to all three counts, and stated that a possible sentence could be twenty years *on each*

count, for a total of sixty years. No factual basis therefore exists for Bernal's assertion that his plea was not knowingly and willingly made.

██ Bernal's final argument is that his sentence is illegal as a matter of law because he cannot be convicted for both possession with intent to distribute and distribution. We need not resolve here the issue of whether intent to distribute is a lesser included offense within the general umbrella of distribution under 21 U.S.C. § 841(a)(1), as the record clearly brings this case within the "separate evidence" test established by *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In the *Blockburger* case the Court held that:

> [t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether they are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* at 304, 52 S.Ct. at 182 (quoted in *Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980)). Distribution and intent to distribute are two distinct statutory provisions within section 841(a)(1). The Eleventh Circuit Court of Appeals recently applied the "separate evidence" test to a section 841(a)(1) violation. *United States v. Carcaise,* 763 F.2d 1328 (11th Cir.1985). As the *Carcaise* court explained,

> Where there is separate evidence of the two offenses, the offenses have not merged ... As to the sentences involving Carcaise's possession with intent to distribute diazepam, and the actual distribution of diazepam, there is an abundance of evidence to show that Carcaise possessed diazepam prior to distributing it. Carcaise admitted that he had diazepam in a warehouse prior to distributing it on March 22 and March 25, 1983.

763 F.2d at 1333–34 (citations and footnote omitted). Here there is abundant evidence that Bernal possessed six kilos of cocaine, in his room in the Sanchez residence, after distributing ten kilos to DEA agents. These two batches of cocaine constitute separate evidence of distribution and pos-

session with intent to distribute. The two counts should not, therefore, as a matter of law, be merged.

### III. *Sanchez's Conviction*

Appellant Sanchez raises three issues in her appeal: (1) whether the district court's *Petrozziello* findings were proper; (2) whether the evidence adduced at trial was sufficient to support the jury's verdict; and (3) whether the district court properly admitted into evidence the government's videotape of the meeting at the Caribe Hilton Hotel involving both Sanchez and Bernal. We consider each issue in turn below.

#### 1. The *Petrozziello* Finding

██ The procedure for determining whether the out-of-court statements of co-conspirators are admissible at trial pursuant to Federal Rule of Evidence 801(d)(2)(E) is well established in this circuit. The trial court must first determine whether it is more likely than not that the declarant and the defendant were members of a conspiracy when the statement was made, and whether the statement furthered the conspiracy. *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977). After this preliminary determination, the co-conspirators' statements will be conditionally admitted and, at the close of the evidence, the trial court will determine whether the prosecution has met its burden, by a preponderance of the evidence, and either let the testimony stand or give the jury the appropriate cautionary instructions. *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). If a cautionary instruction is not sufficient to cure any prejudice that may result from the testimony, the trial court may, on appropriate motion, grant a mistrial. *Id.*

In this case, the trial court properly followed the procedures outlined in *Petrozziello* and *Ciampaglia.* After the jury was selected and before the trial began, the court required the government to make an offer of proof. Out of the hearing of the jury, the prosecutor reviewed the evidence the government would present against Sanchez. The court then made the required *Petrozziello* finding, the jury was called in,

and the trial began. At the close of the government's evidence, again out of the jury's hearing, the court summarized the evidence that had been presented, found that it was more likely than not that Sanchez was part of the conspiracy, and ruled that her co-conspirators' statements were admissible. We find no error in any of the above. Our review of the record also reveals ample independent evidence to support the court's findings. *United States v. Cresta*, 825 F.2d 538, 551 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

#### 2. Sufficiency of the Evidence

■ In challenging the sufficiency of the evidence presented at her trial, appellant Sanchez faces a considerable burden. We will consider the evidence sufficient, if taken as a whole and in the light most favorable to the government, together with all legitimate inferences that can be drawn from such evidence, "a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987), and cases cited therein. Any issue of credibility must be resolved in favor of the jury's verdict and the verdict must stand even if the evidence can support "varying interpretations."

> In other words, the prosecutor need only produce that quantum of evidence by which a reasonable trier of fact *could* find guilt beyond a reasonable doubt; there is no requirement to produce evidence that would *compel* a finding of guilt beyond a reasonable doubt.

*Id.* (emphasis in original).

Sanchez was convicted on two counts: conspiracy to possess with intent to distribute cocaine, and aiding and abetting in the possession with intent to distribute cocaine. Evidence presented at her trial established that Sanchez rented a room in her home to appellant Bernal, possibly the mastermind of this cocaine conspiracy; numerous long-distance calls to Colombia were made from Sanchez's telephone; Sanchez accompanied Bernal to the meeting at the Caribe Hilton pool bar, where co-defendants identified her as one of the owners of the cocaine and Bernal introduced her as his wife; Sanchez accompanied Bernal to the videotaped meeting with undercover DEA agents; Sanchez provided transportation for Bernal over the course of the two days required for negotiations. While certainly mere presence alone is not sufficient to establish membership in a conspiracy, appellant Sanchez was present at several "critical stages of the transaction and was not a mere silent observer." *United States v. Santiago*, 828 F.2d 866, 870 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). It is the jury's function to determine "which of various proferred interpretations of the evidence is credible," and, as the evidence against Sanchez "was far from weak," we find no grounds in the record for overturning her conviction. *Id.*

#### 3. The Videotape

■ Sanchez's final argument is that the government's videotape of the meeting in the Caribe Hilton Hotel should not have been admitted because it was unintelligible in part and permitted DEA agent Morales, in his testimony, to "put words in appellant's mouth." The standard of review is clear, as the principles developed in the context of audio tape recordings apply equally well to videotape recordings:

> This circuit has long followed the generally accepted rule that where a tape recording is challenged on the grounds of inaudibility the question is whether "the inaudible parts are so substantial as to make the rest more misleading than helpful" and that admissibility rests within the discretion of the trial judge.

*United States v. Carbone*, 798 F.2d 21, 24 (1st Cir.1986), and cases cited therein. We have reviewed the videotape at issue, with the permission of counsel at oral argument, and find that it is clear and audible. While it is true, as Sanchez argues, that it is difficult to discern Sanchez's response to Morales suggestion that the group "celebrate" at the conclusion of the meeting, the videotape shows Sanchez sitting near Bernal and Morales throughout the negotiations, nodding and responding to questions and statements by both men, laughing at their jokes, and finally shaking hands with the agents when the meeting ended. We find the inaudible portion at the close of

the meeting, when the four defendants and the two DEA agents left the hotel room, not so substantial that it rendered the rest of the videotape more misleading than helpful. The trial court's decision to admit the videotape did not, therefore, constitute an abuse of discretion.

*Affirmed.*