911 F.2d 847
 31 Fed. R. Evid. Serv. 11
 UNITED STATES, Appellee,
v.
Luis E. GOMEZ-PABON, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Wilfredo TORRES-MELENDEZ, a/k/a "La Bruja," Defendant, Appellant.
UNITED STATES, Appellee,
v.
Edwin DELFIN-TORRES, a/k/a "Wichi," Defendant, Appellant.
UNITED STATES, Appellee,
v.
Luis CASANOVA-OTERO, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Carlos BENITEZ-GUZMAN, a/k/a "Charlie Guzman," Defendant, Appellant.
 Nos. 88-1613 to 88-1617.
 United States Court of Appeals,
First Circuit.
 Heard June 4, 1990.
Decided Aug. 20, 1990.
 
 Joseph C. Laws, Jr., for appellant Gomez-Pabon.
 Charles G. White, for appellant Torres-Melendez.
 Benito I. Rodriguez-Masso, for appellant Delfin-Torres.
 Ludwig Ortiz-Belaval, for appellant Casanova-Otero.
 Roxana C. Matienzo Carrion, for appellant Benitez-Guzman.
 Thomas E. Booth, Appellate Section, Crim. Div., Dept. of Justice, with whom Daniel Lopez-Romo, U.S. Atty., and Jorge Vega-Pacheco, Asst. U.S. Atty., were on brief, for U.S.
 Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and SOUTER,* Circuit Judge.
 BOWNES, Senior Circuit Judge.
 
 
 1
 These are consolidated appeals from convictions on jury verdicts rendered after a nine-day trial. The defendants, Luis Gomez-Pabon, Wilfredo Torres-Melendez, Edwin Delfin-Torres, Luis Casanova-Otero and Carlos Benitez-Guzman, were charged with conspiracy to import cocaine in violation of 21 U.S.C. Secs. 952 and 963 (Count Three). Gomez, Torres, and Delfin also were charged with conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. Secs. 841(a) and 846 (Count One), and conspiracy to import marijuana, in violation of 21 U.S.C. Secs. 952(a) and 963 (Count Two). Each having been convicted and sentenced, defendants now appeal on a number of grounds from their convictions.
 
 I. BACKGROUND
 
 2
 The charges contained in the indictment arose from two unsuccessful operations to import narcotics into Puerto Rico from Colombia. The first operation consisted of an effort, participated in by all five defendants, to hire a pilot to fly cocaine and marijuana from Colombia into Puerto Rico. Unhappily for the defendants, the pilot they recruited, William Martinez-Robles, was a government informant whose subsequent tip to the Drug Enforcement Administration ("DEA") resulted in the seizure of the defendants' airplane. Undeterred by the failure of their first operation and unaware of Martinez's role as an informant, Gomez, Torres and Delfin then hired a second pilot to fly to Colombia--this time solely to obtain marijuana. The second pilot, chosen on the recommendation of Martinez, was an undercover DEA agent, and Gomez, Torres and Delfin were arrested while in the act of paying the pilot for his services. These arrests were followed by the arrests of Benitez and Casanova for their role in the first operation. The five defendants were subsequently indicted and convicted, leading to these appeals.
 
 
 3
 For the most part, the issues raised by defendants on appeal pertain to the first importation scheme. Accordingly, we turn to a more detailed exposition of the facts underlying this operation. As required, we present the facts in the light most favorable to the government.
 
 
 4
 Much of the evidence presented by the government with respect to the cocaine importation scheme consisted of the testimony of the government's informant, Martinez-Robles. Martinez testified that he initially was approached by defendant Benitez in February 1987 and informed that a certain group in Puerto Rico was looking for a pilot to fly drugs into Puerto Rico from Colombia. When Martinez indicated his possible interest in the venture, Benitez arranged a March 3 meeting between Martinez and defendant Gomez, the group's leader, at Benitez's apartment. At this meeting, attended by Martinez, Benitez and Gomez, Gomez offered Martinez $100,000 to fly a load of cocaine and marijuana from Colombia to Puerto Rico in Gomez's airplane. Martinez insisted on test-flying the plane first, which he did on March 4 and March 5. He was accompanied on these flights by his girlfriend Mara Baez, who was also a government informant, and by Gomez.
 
 
 5
 On March 11, Martinez attended another meeting with Gomez. During this meeting, which was attended by the defendant Torres as well, Gomez informed Martinez that the flight to Colombia was scheduled for March 13 and that the defendant Delfin would accompany him on the trip. Gomez, Torres, and Martinez then inspected a road in Puerto Rico that had been designated as the landing area for Martinez upon his return from Colombia.
 
 
 6
 The following day, March 12, Martinez, Gomez and Baez test-flew Gomez's airplane for a third time to inspect the designated landing area from the air. The three subsequently traveled to Delfin's house, where they discussed the flight with Delfin and agreed to meet the next morning to travel to the Arecibo Airport, where Gomez's airplane was located.
 
 
 7
 In accordance with these plans, Gomez, Torres, Delfin, Martinez and Baez met at Delfin's house the following morning, March 13. Gomez gave Delfin money and gifts to bring to the Colombian cohorts. The group then traveled to the airport. At the airport, Martinez observed that the rear seats had been removed from Gomez's airplane to make room for the narcotics and that the plane was fully fueled. Gomez earlier had told Martinez that a man named Casanova would take care of these duties, and also would not log the plane's departure from the airport. Martinez and Delfin then boarded the plane. Before they could take off, however, federal agents approached the plane (having been tipped off by Martinez) and took Martinez away purportedly for questioning, thereby frustrating the mission.
 
 
 8
 Based on the above facts, as well as additional evidence that we discuss later, the jury convicted Gomez, Torres, Delfin, Benitez and Casanova of conspiracy to import cocaine (Count Three). Gomez, Torres and Delfin also were convicted of conspiracy to import marijuana (Count Two) and conspiracy to possess with intent to distribute marijuana (Count One). The convictions on Counts One and Two were based on the actions of Gomez, Torres and Delfin in hiring a second pilot to fly to Colombia after the failure of the first operation. Defendants raise several challenges to these convictions. We consider each of their arguments in turn.
 
 II. JURY SELECTION
 
 9
 Defendants' first contention on appeal is that their convictions must be reversed because a United States Magistrate presided over jury selection in their case. Defendants rest their argument on the Supreme Court's recent decision in Gomez v. United States, --- U.S. ----, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), which held that the Federal Magistrates Act does not authorize district courts to delegate jury selection in felony trials to magistrates. Unlike in Gomez, however, the defendants here failed to object at trial to the jury selection procedure. Whether or not this failure to object prevents defendants from successfully raising a Gomez claim on appeal is an issue that is currently before both the Supreme Court, see United States v. France, 886 F.2d 223 (9th Cir.1989), cert. granted, --- U.S. ----, 110 S.Ct. 1921, 109 L.Ed.2d 285 (1990), and this court sitting en banc. See United States v. Lopez-Pena, 890 F.2d 490 (1st Cir.1989) (opinion withdrawn pending reconsideration en banc ).[1] In light of the pending appeals, we decline to address the jury selection issue here. We preserve the question as an open one and retain appellate jurisdiction. We shall address the matter after the issue has been decided in one or both of the cases just mentioned.
 
 III. SUFFICIENCY OF THE EVIDENCE
 
 10
 Defendants next challenge the sufficiency of the evidence to support the jury's conviction of each of them on Count Three's charge of conspiracy to import cocaine. In reviewing this challenge, we must view the evidence "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." United States v. Angiulo, 897 F.2d 1169, 1197 (1st Cir.1990). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See, e.g., United States v. Aponte-Suarez, 905 F.2d 483, 489 (1st Cir.1990); United States v. Bernal, 884 F.2d 1518, 1523 (1st Cir.1989).
 
 
 11
 To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy. See, e.g., United States v. Aponte-Suarez, 905 F.2d at 489; United States v. Garcia-Rosa, 876 F.2d 209, 223 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990). More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: "intent to agree and intent to commit the substantive offense." United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); see also United States v. Alemany Rivera, 781 F.2d 229, 234 (1st Cir.1985), cert. denied, 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). Such proof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes. See, e.g., United States v. Paradis, 802 F.2d 553, 559 (1st Cir.1986); United States v. Alemany Rivera, 781 F.2d at 234. The government need not prove that a co-conspirator knew all of the details or participated in all of the objectives of the plan. See, e.g., United States v. Aponte-Suarez, 905 F.2d at 489-90; United States v. Rivera-Santiago, 872 F.2d at 1079. Mere presence at the scene of the crime, however, does not establish conspiracy to participate in that crime. Nor does mere association with conspirators. See United States v. Hyson, 721 F.2d 856, 862 (1st Cir.1983); see also United States v. Garcia-Rosa, 876 F.2d at 216.
 
 
 12
 Applying these standards to the facts at hand, we conclude that sufficient evidence exists to support the defendants' convictions for conspiracy to import cocaine. We address the facts pertinent to each defendant in turn.[2]
 
 A. Gomez
 
 13
 According to Martinez's testimony, Gomez recruited Martinez into the cocaine conspiracy with the assistance of Benitez. Gomez also provided the plane to be used in the importation venture. More significantly, he directed every meeting held for planning the flight to Colombia, and he handled all contacts with the people in Colombia who were providing the drugs. In short, Gomez was the mastermind behind the operation. There can be little dispute that the evidence was sufficient to support his conviction on Count Three.
 
 
 14
 Gomez attempts to deflect the force of the evidence by challenging Martinez's testimony as simply the uncorroborated statements of a paid informer. Credibility, however, is not an issue for an appellate court. See United States v. Aponte-Suarez, 905 F.2d at 489; United States v. Garcia-Rosa, 876 F.2d at 226. Martinez's testimony, even if uncorroborated, was sufficient to support Gomez's conviction because "it was not incredible or insubstantial on its face." United States v. Aponte-Suarez, 905 F.2d at 489.
 
 B. Torres
 
 15
 Martinez testified that Torres was present at the March 11 meeting at which Gomez briefed Martinez on the final details concerning the flight to Colombia. After the meeting, Torres then accompanied Martinez and Gomez to check the designated landing area in Puerto Rico. Torres also accompanied Gomez to the meeting at Delfin's house on the morning of the planned flight, and he traveled with Gomez to the Arecibo Airport as well.
 
 
 16
 Torres' attendance at these various meetings is sufficient to support the jury's verdict. Although mere association with other conspirators is not enough to support a conspiracy conviction, Torres' repeated presence at meetings involving the drug operation, in particular his trip to the designated landing area, is enough to support a reasonable jury's inference that Torres' presence was not coincidental, and that Torres was a participant with co-defendants in the cocaine importation scheme. See United States v. Paone, 758 F.2d 774, 776 (1st Cir.1985); see also United States v. Lema, 909 F.2d 561, 569-71 (1st Cir.1990); United States v. LaChance, 817 F.2d 1491, 1494 (11th Cir.), cert. denied, 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987).
 
 C. Delfin
 
 17
 Like Torres, Delfin attended various meetings of the conspirators. Gomez and Martinez met with Delfin at Delfin's house the day before the planned trip to Colombia. These three, together with Torres, then met again at Delfin's house on the morning of the flight to attend to last-minute details. Delfin's presence at these meetings--meetings that non-participants likely would not have attended--supports a reasonable jury's inference that Delfin was a member of the conspiracy. See United States v. Bernal, 884 F.2d at 1523; United States v. Paradis, 802 F.2d at 563-64.
 
 
 18
 In addition, the evidence indicated that Delfin was to fly as Martinez's co-pilot to Colombia. Martinez testified that Gomez had told him Delfin would be his co-pilot. Martinez also observed Gomez giving Delfin gifts and money to bring to Colombia. Finally, Delfin boarded the plane with Martinez on the morning of the planned flight. In light of this seemingly incontrovertible evidence that Delfin was planning to fly as Martinez's co-pilot on the actual drug run, the jury had more than ample support for its conviction of Delfin on Count Three.
 
 D. Benitez
 
 19
 The heart of the government's case against Benitez consisted of Martinez's testimony that Benitez had introduced him to Gomez, thereby assisting the drug ring in its efforts to obtain a pilot. Benitez argues in response that the simple introduction of two individuals is not enough to show that he was part of the conspiracy. As support for this contention, Benitez cites our recent decision in United States v. Aponte-Suarez, 905 F.2d 483 (1st Cir.1990), where we held that a defendant's introduction of a drug conspirator to a third party who had access to an airstrip was insufficient, standing alone, to establish that the defendant had joined the conspiracy. See id., at 491-92; see also United States v. Fernandez, 797 F.2d 943, 946 (11th Cir.1986), cert. denied, 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987); United States v. Tyler, 758 F.2d 66, 68-69 (2d Cir.1985).
 
 
 20
 A careful review of the record, however, supports the inference that in introducing Gomez and Martinez, Benitez was acting as a broker of drug-running services rather than merely making a social introduction. Martinez testified that it was Benitez who approached him to determine whether he was interested in providing pilot services to a drug ring. When Martinez expressed interest, Benitez then arranged the March 3 meeting between Martinez and Gomez, which was held at Benitez's apartment and attended by Benitez. Martinez testified that it was his understanding that Benitez was to be paid for his services in introducing Martinez and Gomez. More specifically, Martinez stated that Benitez had suggested that he drop some drugs from the plane to Benitez on his return flight from Colombia so that Benitez could be sure he was paid.
 
 
 21
 Martinez's testimony was corroborated by the testimony of Mara Baez, who was Martinez's girlfriend and a government informant as well. Baez testified that she was present at the first meeting between Benitez and Martinez and heard Benitez tell Martinez that he knew people who were looking for a pilot. Baez also overheard Benitez ask Martinez to drop some cocaine at a strip where Benitez would be waiting.
 
 
 22
 This evidence supports the conclusion that Benitez actively recruited Martinez on behalf of Gomez's group and was to be paid for his efforts. Benitez's conduct thus differed substantially from the simple introduction considered in Aponte-Suarez. Benitez's conduct was more than sufficient to support the jury's verdict finding him guilty of conspiracy to import cocaine.E. Casanova
 
 
 23
 A significant part of the evidence against Casanova consisted of testimony by Martinez relating certain statements that had been made to him by Gomez. According to Martinez, Gomez had stated that a man named Casanova would ready Gomez's airplane for the flight to Colombia by removing the rear seats and fueling the plane. Gomez also had said that Casanova would not log the plane's departure from the airport and that he would provide a key to a side gate at the Arecibo Airport for Martinez's use upon his return.
 
 
 24
 Casanova responded to this testimony with a defense of mistaken identity. Specifically, he argued that the Casanova referred to by Gomez must have been his son, Manuel Casanova, and that he (Luis Casanova) had been wrongly accused.
 
 
 25
 There is some evidence in the record that supports aspects of the defendant's mistaken identity theory. The defendant does have a son named Manuel Casanova who occasionally worked on airplanes at the Arecibo Airport, where the defendant also worked. Manuel was connected in some respect with the drug conspirators; he was observed at one of the marijuana importation meetings held after the failure of the first operation. A government agent named Juan Picorelli testified that it was his understanding that the man who was to remove the airplane's seats for the March 13 trip to Colombia was named Manuel Casanova. Finally, the defendant Luis Casanova took the stand at trial and denied having removed the rear seats from Gomez's airplane. He admitted fueling the plane, as part of his job at the Arecibo Airport, but stated that he believed he was refueling the plane for a man named Goyco Rodriguez, who he thought to be the owner of the plane, rather than for Gomez. To buttress this last statement, Casanova called as a defense witness a man named Lon Jensen. Jensen testified that he was the prior owner of the airplane and that he had indeed sold it to a man in Puerto Rico named Goyco Rodriguez.
 
 
 26
 Despite this evidence, we conclude that there is sufficient contrary evidence in the record to support the jury's guilty verdict with respect to defendant Luis Casanova. First, our review of Agent Juan Picorelli's testimony reveals that he was hopelessly confused as to the defendant's name. As just one example of this confusion, we note that Picorelli identified the defendant in court as being Manuel Casanova. Picorelli's evident confusion largely undermines the force of his testimony that it was Manuel Casanova who was to remove the rear seats from the airplane. Thus undermined, Picorelli's testimony contributes little to the defendant's mistaken identity argument.
 
 
 27
 Second, it bears emphasis that Gomez's precise statement to Martinez was that a man named Casanova would fuel the plane, remove the rear seats, provide a key to the side gate, and not log the plane's departure from the airport. There was no indication that more than one man would be providing these services. Because defendant Luis Casanova admitted fueling the plane, a reasonable jury could infer that he was the Casanova who was to do the rest, including the removal of the rear seats. Such an inference also is supported by the absence of any evidence in the record that Manuel Casanova held a position at the Arecibo Airport that would enable him to obtain a key to the side gate or give him the authority to log (or not to log) plane departures. The defendant Luis Casanova did hold such a position and had such authority.
 
 
 28
 Perhaps the most significant evidence against Casanova was provided by the testimony of government informant Mara Baez. Baez accompanied Martinez and Delfin to the Arecibo Airport on the day of the planned flight to Colombia. Observing federal agents approach Gomez's airplane after Martinez and Delfin had boarded it, Baez initiated a conversation with the defendant Luis Casanova, who was standing nearby. In the course of this conversation, which was related by Baez in her testimony at trial, Casanova stated that he had wanted to signal Martinez and Delfin about the presence of the agents, but was unable to do so. He also stated that he had not been able to telephone Gomez with a warning because he did not have Gomez's phone number. Casanova cautioned Baez that she was to say in response to any questions that she did not know Gomez, and that she was not to say that Gomez owned the plane. Finally, Casanova also stated to Baez that if any trouble occurred, it would be because they had removed the airplane's seats that morning.
 
 
 29
 These statements of Casanova to Baez are not the remarks of an innocent man who was ignorant of any wrongdoing involving the plane he admitted fueling or who was unjustly accused for the actions of his son. To the contrary, the statements strongly support the conclusion that the Casanova referred to by Gomez as assisting the conspirators in the preparation of their flight plans was the defendant Luis Casanova. We find sufficient basis in the record for a jury to conclude that Luis Casanova was a participating member in the cocaine importation scheme.
 
 IV. ADMISSION OF CO-CONSPIRATOR STATEMENTS
 
 30
 Each defendant next challenges the admission at trial of various co-conspirator statements under Fed.R.Evid. 801(d)(2)(E). None of the defendants identifies the particular co-conspirator statements to which he is objecting. Rather, each defendant broadly challenges all co-conspirator statements that were admitted against him on Count Three's cocaine conspiracy charge.
 
 
 31
 To admit co-conspirator statements under Fed.R.Evid. 801(d)(2)(E), "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.' " Bourjaily v. United States, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); see also United States v. Rivera-Santiago, 872 F.2d at 1085. Under the Federal Rules of Evidence, it is the responsibility of the trial judge to make this determination. See, e.g., United States v. Petrozziello, 548 F.2d 20, 22-23 (1st Cir.1977). The proper standard for the district court to apply is to inquire whether the government has met the requirements of Fed.R.Evid. 801(d)(2)(E) by a preponderance of the evidence. See, e.g., United States v. Angiulo, 897 F.2d at 1201. We, in turn, must accept the lower court's findings of facts that certain statements were made by a co-conspirator during the course and in furtherance of a conspiracy unless the findings were clearly erroneous. See United States v. Green, 887 F.2d 25, 27-28 (1st Cir.1989); United States v. Patterson, 644 F.2d 890, 894 (1st Cir.1981).
 
 
 32
 Defendants focus their challenge to the trial court's 801(d)(2)(E) findings on the sufficiency of the evidence to show their membership in a cocaine importation conspiracy. Each defendant contends that insufficient evidence exists to prove his membership in such a conspiracy, and therefore that the first requirement of Rule 801(d)(2)(E) has not been satisfied.
 
 
 33
 This challenge to the admission of co-conspirator statements duplicates, in large part, the defendants' various challenges to the sufficiency of the evidence underlying their convictions on Count Three, which we discussed at length in Section III, supra. There is no need to set forth again all the evidence against each defendant. Suffice to say that for the same reasons as articulated in Section III, we conclude that sufficient evidence exists to support a finding that the defendants all were members of a conspiracy to import cocaine. Accordingly, we reject defendants' 801(d)(2)(E) challenges.[3]V. IMPROPER CROSS-EXAMINATION
 
 
 34
 The next issue raised on appeal involves the prosecutor's cross-examination of Lon Jensen, a defense witness called by Casanova. Jensen testified on direct that he had been the previous owner of the airplane that was seized by federal agents at the Arecibo Airport on March 13. Jensen stated that he had sold the plane to a man named Goyco Rodriguez in Puerto Rico. This testimony ostensibly corroborated Casanova's theory of defense, which was that he had innocently fueled the airplane later seized by federal agents in the belief that the plane was owned by a man named Goyco Rodriguez.
 
 
 35
 As part of her cross-examination, the prosecutor asked Jensen three times whether he was under investigation for drug smuggling.[4] Casanova's counsel objected to these questions as improper, but the trial court overruled the objection. The following day, however, the court changed its ruling and instructed the jury to disregard the three questions. The court later repeated this cautionary instruction in its final charge to the jury.
 
 
 36
 Casanova argues on appeal that the questions asked by the prosecutor on cross-examination were not only improper, presumably under Fed.R.Evid. 608(b), but also irreparably harmful to Jensen's credibility, and therefore irreparably harmful to Casanova's credibility. Casanova contends that the prejudice could not be undone by the court's later instructions to the jury to disregard the questions, and he urges us to reverse and remand for a new trial because of this prejudice.
 
 
 37
 At the outset, we assume without deciding that the district court was correct in ruling the cross-examination questions improper.[5] The issue then becomes whether the questions were sufficiently prejudicial to require a new trial. We think not. The three questions were isolated; the witness answered them in the negative; and the prosecutor never referred to the matter again. Moreover, the trial court issued two explicit cautionary instructions, telling the jury to disregard the questions in their deliberations. These factors weigh against finding sufficient prejudice to warrant reversal. See, e.g., Greer v. Miller, 483 U.S. 756, 765-66, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987) (only one improper question was asked and two curative instructions were given); United States v. Schwab, 886 F.2d 509, 514 (2d Cir.1989) (witness answered improper question in the negative, no evidence was introduced to dispute the denial, and court promptly issued corrective instructions), cert. denied, --- U.S. ----, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); United States v. Cardenas, 778 F.2d 1127, 1132 (5th Cir.1985) (trial court granted defendant's motion to strike improper prosecutorial question); United States v. Elkins, 774 F.2d 530, 535-36 (1st Cir.1985) (court immediately issued corrective instruction and incident was never referred to again by the prosecution).
 
 
 38
 We place particular emphasis on the trial court's issuance of the cautionary instructions. There is ordinarily a presumption that a jury will follow such curative instructions. This presumption will be defeated only if there is "an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect ... would be 'devastating' to the defendant." Greer v. Miller, 483 U.S. at 766 n. 8, 107 S.Ct. at 3109 n. 8 (citations omitted); United States v. Paiva, 892 F.2d 148, 160 (1st Cir.1989).
 
 
 39
 We find no such circumstances present in this case. First, Casanova has articulated no basis for finding an overwhelming probability that the jury was unable to follow the court's corrective instructions. Second, although the potential for improper questioning to have a "devastating effect" is greater in cases such as this, where the evidence of guilt is largely circumstantial, we can find no such devastating effect to Casanova on the facts before us. We recognize that simply by posing the questions, the prosecutor cast some doubt on Jensen's credibility and therefore indirectly cast doubt on Casanova's credibility as well. These were only questions, however, not evidence, and Jensen denied them. Moreover, the questions were not the only grounds on which the jury could have based a disbelief of Jensen or of Casanova. Martinez testified that, in accordance with Gomez's instructions, he filled out new owner registration papers for Gomez's airplane in the name of Goyco Rodriguez. Martinez stated that he had never met a Goyco Rodriguez and did not believe such a man existed. Baez testified that Casanova had warned her not to say that Gomez was the true owner of the plane. In light of this testimony, we cannot conclude that the prosecutor's challenged questions to Jensen were a "devastating" link in persuading the jury to disbelieve either Jensen or Casanova, even assuming that the jury violated the trial court's clear instructions and considered the questions in their deliberations. At most, the questions were cumulative of other evidence introduced by the government to cast doubt on Jensen's and Casanova's claim of a "Goyco Rodriguez." Consequently, we find no likelihood of a devastating effect sufficient to warrant reversal.
 
 VI. READING OF INDICTMENT
 
 40
 Benitez challenges on appeal the failure of the district court to read the indictment to the jury at the outset of trial. Apparently, the trial judge believed that the magistrate who presided over the jury selection had read the indictment to the jury. When Benitez's counsel informed the court during the third day of trial that the magistrate had not done so, the court immediately read and explained the charges to the jury. This corrective action, however, did not occur until after the jury had heard the testimony of the government's chief witness, Martinez.
 
 
 41
 Benitez contends that the court's delay in reading the indictment irreparably prejudiced his case because it resulted in the jury's having heard a substantial portion of the government's evidence before being informed that Benitez was only charged with one count in the three count indictment. As a result, Benitez argues, the jury must have been hopelessly confused in trying to differentiate among the defendants, the charges and the evidence, thus creating a strong possibility that Benitez may have been found guilty on the basis of evidence that had no relevance to the single charge against him, but rather pertained to the multiple charges against his co-defendants.
 
 
 42
 In considering this claim, we note that Benitez did not object at the outset of trial to either the magistrate's or the court's failure to read the indictment to the jury. Benitez raised the issue only after Martinez's testimony, at which time the court promptly corrected what appears to have been an oversight. Due to Benitez's failure to make a timely objection, the plain error standard governs our review of the issue. Under the plain error rule, an alleged error will warrant a new trial only if the error, when considered in the context of the entire trial, was such as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985); United States v. Johnson, 893 F.2d 451, 454 (1st Cir.1990). Such errors are to be found only in exceptional cases, where the errors are "so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below." United States v. Griffin, 818 F.2d 97, 100 (1st Cir.), cert. denied, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).
 
 
 43
 Applying this standard to the facts at issue, we find no plain error. Our review of the record reveals that the magistrate broadly summarized the indictment to the jury, describing it as charging the defendants with membership in a conspiracy to possess with the intent to distribute and to import quantities of controlled substances. Benitez is correct in pointing out that the magistrate's summary failed to indicate that Benitez and Casanova were only charged with one of three counts contained in the indictment. The district court, however, remedied any confusion that this omission may have caused when it read the full indictment to the jury immediately after Benitez's counsel raised the issue on the third day of trial.[6] Moreover, the court repeatedly cautioned the jury throughout the entire trial that Benitez and Casanova were only charged with one count, and that certain evidence could only be considered against Gomez, Torres and Delfin because it pertained to the other two counts. These warnings eliminated any confusion that might have remained on the part of the jury as to the nature of the charges and the evidence against each defendant. Considering the district court's conduct in the context of the trial as a whole, we find no miscarriage of justice and no plain error in the court's failure to read the indictment to the jury at the outset of trial. Cf. United States v. Mendoza, 574 F.2d 1373, 1381-82 (5th Cir.) (finding no error in the trial court's failure to read the indictment to the jury), cert. denied, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); Martin v. United States, 335 F.2d 945, 950 (9th Cir.1964) (same); Robles v. United States, 279 F.2d 401, 403-04 (9th Cir.1960) (same), cert. denied, 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745 (1961); Nick v. United States, 122 F.2d 660, 670 (8th Cir.) (same), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941).
 
 VII. SEVERANCE
 
 44
 Casanova and Benitez next challenge the trial court's denial of their motions for severance. They argue, in essence, that they were prejudiced by evidentiary spillover as a result of having been tried jointly with co-defendants who had committed a greater number of offenses and against whom the evidence was significantly more strong. We are not persuaded.
 
 
 45
 A motion for severance is addressed to the discretion of the trial court, and the court's denial of such motion will be overturned only when a defendant has made a showing of prejudice sufficient to conclude that there has been a clear abuse of discretion. See, e.g., United States v. Angiulo, 897 F.2d 1169, 1194 (1st Cir.1990); United States v. Drougas, 748 F.2d 8, 18 (1st Cir.1984). We find no such prejudice and no abuse of discretion here. Simply because Casanova and Benitez participated in fewer criminal acts than their co-defendants does not amount to a showing of prejudice sufficient to entitle them to a separate trial. See United States v. Aponte-Suarez, 905 F.2d 483, 494 (1st Cir.1990); United States v. Cresta, 825 F.2d 538, 554-55 (1st Cir.1987), cert. denied, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). Moreover, as we noted earlier, the trial court gave careful limiting instructions throughout the course of the trial, repeatedly instructing the jury that Casanova and Benitez were only charged with one count, and that certain evidence should not be considered against them because it pertained to the other two counts. These limiting instructions adequately neutralized the potential for prejudicial evidentiary spillover. See, e.g., United States v. Doherty, 867 F.2d 47, 63-64 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989); United States v. Drougas, 748 F.2d at 18-19. We reject defendants' severance claims.[7]
 
 VIII. GOMEZ'S SENTENCE
 
 46
 The district court imposed consecutive sentences on Gomez for his convictions on Counts One, Two and Three. Gomez challenges on appeal the court's decision to impose consecutive rather than concurrent sentences, claiming that the facts underlying the charges against him were part of but a single conspiracy and thus that it violated double jeopardy principles for the district court to impose consecutive sentences. In response, the government concedes that the conduct charged in Counts Two and Three was part of the same conspiracy, and it consequently recommends that Gomez's conviction and sentence on Count Two be vacated. The government maintains, however, that Counts One and Three are based on separate offenses and merit consecutive sentences.
 
 
 47
 We first consider the question of whether the district court properly could impose consecutive sentences on Counts Two and Three. These counts both charged violations of 21 U.S.C. Secs. 952 and 963. The distinction between them is that Count Three charged a conspiracy to import cocaine, whereas Count Two charged a conspiracy to import marijuana. In determining whether two charged conspiracies that allege violations of the same substantive statute are actually the same offense for double jeopardy purposes, we consider five factors: (a) the time during which the activities occurred; (b) the persons involved; (c) the places involved; (d) whether the same evidence was used to prove the two conspiracies; and (e) whether the same statutory provision was involved in both conspiracies. United States v. Garcia-Rosa, 876 F.2d 209, 228 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990); United States v. Booth, 673 F.2d 27, 29 (1st Cir.), cert. denied, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). We examine each of these factors in turn.
 
 A. Time
 
 48
 Count Two of the indictment alleged a conspiracy "[f]rom on or about March 4, 1987, up to and including March 25, 1987"; Count Three alleged a conspiracy "[f]rom on or about February 11, 1987, up to and including March 13, 1987." The overlap in time tends to support the existence of one continuous conspiracy.
 
 B. Personnel
 
 49
 A significant overlap also exists in the people involved. Count Two charged Gomez, Torres and Delfin as the conspirators; Count Three listed the same trio plus Benitez and Casanova. Moreover, Gomez was the central character in both alleged conspiracies, and Martinez was solicited to serve as the pilot of each venture.
 
 
 50
 That Benitez and Casanova were not indicted on Count Two does not detract from a finding that the two operations were part of one conspiracy. Benitez's role was to introduce the pilot to the conspirators. That act only had to be performed once. Casanova's role was to fuel the plane, remove the seats, and refrain from recording the plane's departure from the airport. The conspiracy alleged in Count Two never reached the stage when these services were required.
 
 C. Location
 
 51
 Both counts alleged that the conspirators planned to import drugs from La Guajira, Colombia to Puerto Rico and that all of the overt acts occurred in Puerto Rico. The identity of the places involved in the two counts tends to support the existence of one conspiracy.
 
 D. Evidence
 
 52
 The first overt act alleged in Count Two is that Gomez and Torres took Martinez, on March 11, to the designated landing area ("drop-off site") for the plane carrying the narcotics from Colombia. The same visit was alleged as an overt act in Count Three. This duplication in overt acts also indicates that the two counts constituted one conspiracy to import illicit drugs.
 
 E. Statutory Provisions
 
 53
 As we noted at the outset, both Counts Two and Three alleged violations of 21 U.S.C. Secs. 952 and 963. Although the drug involved in Count Two was marijuana and that in Count Three cocaine, we do not think this distinction establishes two separate conspiracies. Rather, it suggests that when the first venture was thwarted, the conspirators simply adapted their plan to the situation. See United States v. Kalish, 690 F.2d 1144, 1151 (5th Cir.1982) (government erred in charging two conspiracies where initial venture was blocked by seizure of boat and arrest of crew but other operations continued as planned), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).
 
 
 54
 From all of the foregoing, we conclude that the district court erred in imposing consecutive sentences on Gomez for his convictions on Counts Two and Three. The conduct alleged in Count Two constituted no more than a continuation of the same drug conspiracy charged in Count Three, not a separate offense. Accordingly, we vacate Gomez's conviction and sentence on Count Two. In addition, we note that defendants Delfin and Torres also were convicted on both Counts Two and Three.[8] Although they received concurrent rather than consecutive sentences for their dual convictions, adverse consequences still could result from the fact that two separate convictions issued. Such consequences might include delayed eligibility for parole or the possibility of an increased sentence under a recidivist statute for a future offense. Ball v. United States, 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985). Accordingly, for the same reasons that we vacate Gomez's conviction and sentence on Count Two, we vacate the convictions and sentences of Delfin and Torres on Count Two as well.
 
 
 55
 We next consider whether the district court properly could impose consecutive sentences on Gomez for his convictions on Counts One and Three. As noted earlier, Count Three charged violations of 21 U.S.C. Secs. 952 and 963. Count One charged violations of 21 U.S.C. Secs. 841(a) and 846. When a defendant is charged with the violation of two distinct statutory provisions, the test for determining whether the two offenses are the same for double jeopardy purposes "focuses on the elements of each provision and inquires 'whether each provision requires proof of a fact which the other does not.' " United States v. Garcia-Rosa, 876 F.2d at 227 (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).
 
 
 56
 Applying this test to the conspiracy offenses charged in Counts One and Three, we observe that the statutory provisions invoked in each count differ from one another in what they specify as the proscribed object of the conspiracy. Count One specifies "possession with intent to distribute" as the object of the conspiracy, whereas Count Three specifies "importation" as the ultimate objective. Because of this distinction between the two sets of statutory provisions, we conclude that consecutive sentences properly could be imposed on Counts One and Three. See Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (convictions for conspiracy to import marijuana and conspiracy to distribute marijuana warrant consecutive sentences even though the violations arose from a single agreement with dual objectives); United States v. Davis, 809 F.2d 1194, 1205-06 (6th Cir.), cert. denied, 483 U.S. 1007, 107 S.Ct. 3234, 3235, 97 L.Ed.2d 740 (1987); see also United States v. Sockwell, 699 F.2d 213, 217 (5th Cir.) (conspiracy to possess marijuana with intent to distribute and conspiracy to import marijuana are separate crimes with distinguishable statutory elements and proof requirements), cert. denied, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 311 (1983).
 
 IX. BENITEZ'S SENTENCE
 
 57
 Benitez contends that the twenty-year sentence he received for his conviction on Count Three was excessive in comparison to the sentences of his co-defendants. We note at the outset that because the events in question occurred in February and March 1987, the Sentencing Guidelines, which are applicable to crimes committed after November 1, 1987, do not govern here. See Pub.L. No. 98-473, Sec. 235, as amended, reprinted at 18 U.S.C. Sec. 3551 note (1988) (effective date of Guidelines). In a pre-Guidelines case, the sentencing judge has very broad discretion in determining the appropriate punishment in a particular situation. Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970). An appellate court will ordinarily not review a sentence unless it exceeds statutory limits or "is so disproportionate to the offense for which it was imposed that it constitutes cruel and unusual punishment." United States v. Francesco, 725 F.2d 817, 823 (1st Cir.1984); see also United States v. Bernal, 884 F.2d 1518, 1520 (1st Cir.1989). Furthermore, a defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences. United States v. Bernal, 884 F.2d at 1520; Gregory v. United States, 585 F.2d 548, 550 (1st Cir.1978); see also United States v. Ibern-Maldonado, 823 F.2d 698, 699 (1st Cir.1987) (sentencing court's imposition of longer sentence on defendant did not demonstrate judicial vindictiveness).
 
 
 58
 The statutory penalty for Benitez's crime, conspiracy to import cocaine, is "a term of imprisonment of not less than 10 years and not more than life ..., a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $4,000,000 ..., or both." 21 U.S.C. Sec. 960(b)(1) (1988). While a twenty-year term of imprisonment is lengthy, it is within these limits. Furthermore, it is in line with defendant's role in the conspiracy. By introducing the pilot Martinez to Gomez, Benitez made possible not only the initial plan to fly cocaine from Colombia to Puerto Rico but also the subsequent marijuana importation scheme. While it is true that Benitez's sentence for Count Three, the only count with which he was charged and convicted, is longer than the sentences of his co-conspirators on the same count,[9] it does not exceed the statutory limit and does not constitute cruel and unusual punishment.
 
 X. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 59
 The final issue raised on appeal is Gomez's claim of ineffective assistance of counsel at trial. Gomez's claim revolves around his attorney's failure to introduce at trial certain medical evidence demonstrating Gomez's history of mental illness. Gomez contends that his attorney should have argued as a theory of defense that Gomez's mental illness precluded his formation of the necessary intent to commit the offenses charged.
 
 
 60
 Our review of the record reveals that Gomez failed to raise this ineffective assistance claim in the district court. Because the claim was not raised properly below, and because consideration of the claim will require the development of facts not contained in the record, we follow the oft-stated rule in this circuit and decline to consider the claim in the first instance on appeal. See, e.g., United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir.1989); United States v. Costa, 890 F.2d 480, 482-83 (1st Cir.1989). We do so without prejudice to any right Gomez may have to pursue the issue of ineffective assistance of counsel in a proceeding brought pursuant to 28 U.S.C. Sec. 2255.
 
 XI. CONCLUSION
 
 61
 We find sufficient evidence to support the jury's verdict against each defendant on the cocaine conspiracy charge (Count Three). We also find sufficient evidence to support the trial court's admission of co-conspirator statements. We reject the arguments made by various defendants that the prosecutor's cross-examination of Jensen, the district court's delay in reading the indictment to the jury, and the court's denial of defendants' motions for severance warrant a new trial. We also reject Benitez's argument that he received an excessive sentence, and we decline to reach Gomez's claim of ineffective assistance of counsel. We conclude, however, that the district court impermissibly gave Gomez consecutive sentences on Counts Two and Three, and we vacate Gomez's conviction and sentence on Count Two. We also vacate Delfin's and Torres' convictions and sentences on Count Two. Finally, we hold open the defendants' jury selection claim and retain appellate jurisdiction for the time being, see supra Section II.
 
 
 62
 So Ordered.
 
 
 
 *
 Judge Souter heard oral argument in this matter, and participated in the semble, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The original panel decision involved six consolidated cases (No. 87-2003 through No. 87-2008) and was reported sub nom. United States v. Lopez-Pena. Only three of the defendants petitioned for rehearing en banc. The petition was granted on February 9, 1990 sub nom. United States v. Martinez-Torres
 
 
 [2]
 In analyzing the evidence, we treat the facts as if the operation to import cocaine involved a conspiracy that was entirely distinct from the later operation to import marijuana. Although we have doubts about the existence of such a neat division, and believe it more accurate to view the cocaine and marijuana importation schemes as simply elements of one continuing conspiracy, see Section VIII, infra, the government charged this conduct as two separate conspiracies. In any event, it only aids the defendants in their challenges to the sufficiency of the evidence for us to treat the facts as reflecting two distinct conspiracies
 
 
 [3]
 It may seem anomalous, at first glance, that we rely on Section III's reasoning to dismiss defendants' objections to the admission of co-conspirator statements. Section III's conclusions as to the sufficiency of the evidence rested, in part, on the very co-conspirator statements whose admission is challenged by defendants. It is now settled, however, that we may properly consider the co-conspirator statements themselves as part of an 801(d)(2)(E) inquiry into the sufficiency of evidence to support the existence of a conspiracy. We acknowledge that it is unclear whether such statements can be sufficient standing alone to ground a finding of conspiracy for purposes of 801(d)(2)(E). See Bourjaily v. United States, 483 U.S. at 180-81, 107 S.Ct. at 2781-82; United States v. Rivera-Santiago, 872 F.2d at 1092-93. We need not reach this question on the facts of this case, however, due to our conclusion that sufficient corroborating evidence exists independent of the challenged co-conspirator statements to support the trial court's 801(d)(2)(E) findings. This corroborating evidence has largely been set forth in Section III, although it was not identified as such. As to Gomez, Benitez and Casanova, it includes the statements they made to Martinez and Baez, respectively, which are admissible as admissions under Fed.R.Evid 801(d)(2)(A). See United States v. Patterson, 644 F.2d 890, 893 (1st Cir.1981). As to Torres and Delfin, the corroborating evidence includes their attendance at various meetings of the conspirators, see United States v. Rivera-Santiago, 872 F.2d at 1093; Gov't of Virgin Islands v. Brathwaite, 782 F.2d 399, 404 (3d Cir.1986), as well as Torres' conduct in inspecting the designated landing area and Delfin's conduct in boarding the airplane with Martinez for the flight to Colombia
 
 
 [4]
 The specific colloquy was as follows:
 Q: Sir, isn't it true that you have been under investigation for providing airplanes for drug smuggling in Missouri? ...
 A: No, that's not true.
 Q: Isn't it true that the Missouri Bureau of Investigation has been questioning you about drug smuggling?
 A: I've never been questioned by them.
 Q: Sir, isn't it true that you had airplanes on your company flying drugs from Missouri to Nevada?
 A: No, that's not true.
 
 
 [5]
 Although we assume, for the sake of discussion, that the questions were improper, we note that the prosecutor volunteered to call law enforcement officials from Missouri to attest to the foundation for these questions
 
 
 [6]
 We do not mean to imply that district courts are absolutely required to read indictments to the jury at the outset of trial. It is certainly within a court's discretion to decline to read an indictment on the ground that reading the indictment would unduly prejudice certain defendants. Cf. United States v. Williams, 809 F.2d 75, 78-79 (1st Cir.1986) (noting that the trial court had refused to submit the indictment to the jury because it referred to many incidents involving people other than the defendants and thus was highly prejudicial), cert. denied, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987); United States v. Polizzi, 500 F.2d 856, 876 (9th Cir.1974) ("The decision to read the indictment to the jury is within the sound discretion of the trial court...."), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 803, 42 L.Ed.2d 820 (1975)
 
 
 [7]
 To the extent Benitez and Casanova challenge the initial joinder of their cases under Fed.R.Crim.P. 8(b), we find that the overlapping nature of the two conspiracies charged here, and in particular, the substantial identity of facts, legal issues, and participants, clearly permitted joinder of all defendants in this case. See, e.g., United States v. Doherty, 867 F.2d at 63; United States v. Arruda, 715 F.2d 671, 678-79 (1st Cir.1983)
 
 
 [8]
 Delfin and Torres did not explicitly raise the issue of their convictions on Count Two in their briefs. At the government's request, however, we have decided to address the question
 
 
 [9]
 Gomez and Torres each received sentences of sixteen years on Count Three. Delfin and Casanova received sentences of ten years