# United States Court of Appeals
## For the First Circuit

No. 01-1799

UNITED STATES OF AMERICA,

Appellee,

v.

WANDA LLINAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Boudin, Chief Judge,

Lipez and Howard, Circuit Judges.

Rafael F. Castro Lang for appellant.
Thomas F. Klumper, Assistant United States Attorney with
whom H.S. Garcia, United States Attorney and Sonia I. Torres-Pabón,
were on brief, for appellee.

June 18, 2004

**HOWARD**, **Circuit Judge**. Following a five-day trial, a jury convicted defendant-appellant Wanda Llinas of both conspiracy to possess narcotics with intent to distribute and intentional use of a communication device in facilitating the conspiracy. Llinas now appeals these convictions, alleging that there was (1) insufficient evidence to support the verdicts and (2) reversible error arising out of the district court's decision to admit certain evidence in violation of Rule 12.1(b) of the Federal Rules of Criminal Procedure. We affirm.

## I.

We recite the relevant facts in the light most favorable to the verdicts. See United States v. Echeverri, 982 F.2d 675, 676 (1st Cir. 1993).

Daniel Sanchez and Wilson Martínez Cotto became friends in or about January 2000, and, within a few days, Sanchez began selling heroin to Martínez for distribution. Soon thereafter, Sanchez told Martínez about a recent encounter he had had with a man called "Guillermo," who had proposed that Sanchez visit Puerto Rico to conduct some drug deals. Martínez was interested. Neither Sanchez nor Martínez was aware that Guillermo was a government informant.

In June 2000, Sanchez and Martínez traveled together to Puerto Rico, where Sanchez was to introduce Martínez to Guillermo. For his part, Martínez tended to the lodging details, initially

arranging for the pair to stay at a relative's house. After arriving in Puerto Rico, however, these initial arrangements fell through. In search of a place to stay, Martínez then phoned Llinas's stepfather, a family friend, and arranged for the men to stay at his house. Llinas lived with her stepfather.

On June 16th, Llinas drove Sanchez and Martínez to a nearby bakery. While Llinas waited in her car with her stepfather, Sanchez and Martínez entered the bakery and met with Guillermo and his partner, Carrasquillo, an undercover agent for the Drug Enforcement Administration. There, the men negotiated a transaction in which Martínez agreed to provide, on a later date, two kilograms of heroin in exchange for eleven kilograms of cocaine.

Approximately one-half hour after entering the bakery, Sanchez and Martínez exited, and Llinas drove them back to her stepfather's home. Having earned his commission by introducing Martínez to Guillermo, Sanchez departed Puerto Rico.

Martínez did not hear from Carrasquillo until June 30th, when they spoke via cellular telephone. During the course of this coded-language conversation, Martínez informed Carrasquillo that "at hand, I have one and a half . . . then by Sunday, I'll have another two . . . it would be three and a half." The men agreed to

exchange the drugs —- or, as Martínez put it, "cook the goose" —- on July 3rd.[1]

On the morning of July 3rd, Martínez contacted Carrasquillo to arrange the meeting for that day.  A few hours later, in Llinas's presence, Martínez again phoned Carrasquillo and informed him that he "went by the office and [] picked the papers up there with the, the, stamps on them and all that . . . ."  The men then agreed to meet at the parking lot of El Comandante racetrack between 4:00 and 4:30 p.m.  At this point in the conversation, Martínez handed Llinas the cellular phone to receive directions to the racetrack.

According to Llinas, Martínez had asked her to drop him off at the racetrack, where he was to meet a friend who would pick him up.  After dropping Martínez off, Llinas and her boyfriend, José Arroyo, planned on driving to the beach for the Fourth-of-July holiday.

On the way to the racetrack, Llinas and Martínez picked up Arroyo in a rental car that Arroyo allegedly had rented for the weekend.  They subsequently made a quick stop at a supermarket to purchase provisions for the beach.  While Llinas and Arroyo were

---

[1]Pointing to background voices that can be heard on Agent Carrasquillo's tape-recording of the June 30th conversation, the government repeatedly asserts in its brief that Llinas was present during this dialogue.  We cannot conclude that this assertion is supported by the record; accordingly, we will not consider it.

inside, Martínez waited in the parking lot and made two additional calls to Carrasquillo.

Having completed this errand, the trio set off for the rendezvous at the racetrack. Martínez was driving; Arroyo was in the passenger seat and Llinas was in the back. Next to Llinas in the backseat were two cellular telephone boxes stacked inside a large plastic bag. The boxes contained plastic bags filled with 1787 grams of heroin.

At approximately 4:30 p.m., they arrived at the racetrack's parking lot. Martínez parked the car, exited, and approached Carrasquillo. Llinas and Arroyo remained inside. According to Llinas's testimony, Martínez had asked them to wait "because he was going to decide where he was going with his friend."

Upon agreeing with Carrasquillo to proceed with the exchange, Martínez walked over to the car, opened the rear door, and asked Llinas to hand him the bag next to her. According to Llinas, after she handed Martínez the bag that she believed contained cellular telephones, she "asked him whether we could leave yet and he said no because the friend that was going to pick him up hadn't arrived yet." Carrasquillo and Martínez then moved to the back of the car to inspect the bag's contents. Once certain that the boxes contained a heroin-like substance, Carrasquillo signaled for the arrest of Martínez, Llinas, and Arroyo.

On July 26, 2000, Llinas was arraigned on a three-count indictment. Count I charged Llinas, Arroyo and Martínez with conspiracy with the intent to possess and distribute two kilograms of a substance containing a detectable amount of heroin and five kilograms of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1); Count II charged Llinas and her co-defendants with aiding and abetting possession with the intent to distribute approximately two kilograms of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and Count III charged Llinas and Martínez with aiding and abetting each other in using a communication facility to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2.

On November 21, 2000, a joint trial began; Llinas and Arroyo were co-defendants.[2] On November 28, 2000, a jury found Llinas guilty on Counts I and III and not guilty on Count II. Arroyo was acquitted on all counts. On April 24, 2001, the district court sentenced Llinas to concurrent prison terms of 123 months for Count I and 24 months for Count III, three years of supervised release, and $200 in special assessments.

This appeal followed.

---

[2]Prior to trial, Martínez had entered a guilty plea. Notwithstanding his cooperation with the government, Martínez did not testify at Llinas's trial.

We are presented with two issues on appeal: (1) whether there was sufficient evidence to support Llinas's convictions; and (2) whether the district court erred when it allowed the government to introduce certain documents and testimony, neither of which were noticed to Llinas as allegedly required by Rule 12.1(b) of the Federal Rules of Criminal Procedure.

Given these separate issues, two standards of review apply. First, in deciding sufficiency challenges, "we review all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found guilt beyond a reasonable doubt."[3] United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001); see also United States v. Ruiz, 105 F.3d 1492, 1495 (1st Cir. 1997) (noting that "we review de novo the defendants' challenge to the evidentiary sufficiency of their convictions, construing the evidence in the light most favorable to the government"). As to the second issue, because the district court's

---

[3]Following the government's presentation of its case-in-chief, Llinas unsuccessfully moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Llinas thereafter presented evidence in her defense, thus waiving review of her initial motion. See United States v. Ruiz, 105 F.3d 1492, 1495 n.1 (1st Cir. 1997) (citing United States v. Amparo, 961 F.2d 288, 291 (1st Cir. 1992)). Therefore, we review the evidence presented by Llinas during her case-in-chief in the light most favorable to the verdicts. See Ruiz, 105 F.3d at 1495 n.1.

decision to admit the alibi-rebuttal evidence was based on its construction of Rule 12.1(b), we proceed de novo. See United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996) (noting that, because the district court's rejection of a motion turned on its construction of a rule of criminal procedure, the court would review the decision de novo); see also United States v. Encarnacion, 239 F.3d 395, 397 (1st Cir. 2001) ("We review de novo the district court's construction of the Federal Rules of Criminal Procedure." (citation omitted)).

### A. Sufficiency of the Evidence

Llinas's principal argument on appeal is that her convictions should be reversed because there was insufficient evidence at trial to sustain either (1) a finding that she conspired to possess narcotics with the intent to distribute or (2) a finding that she used a communication device to facilitate such a conspiracy. We disagree.

**(1) Conspiracy Count**

Llinas contends that "the evidence taken as a whole failed to establish her knowing, intentional participation in the drug conspiracy . . . beyond a reasonable doubt . . . ." More specifically, she argues that, "[a]side from the total lack of evidence presented by the government concerning her knowledge and criminal intent[,] there is a substantial amount of evidence that established that [she] did not know about [the conspiracy]."

> To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy. More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: intent to agree [with her co-conspirators] and intent to commit the substantive offense. Such proof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes. The government need not prove that a co-conspirator knew all of the details or participated in all of the objectives of the plan.

United States v. Gomez-Pabon, 911 F.2d 847, 852-53 (1st Cir. 1990) (citations and quotation marks omitted); United States v. Nelson-Rodriguez, 319 F.3d 12, 27 (1st Cir. 2003) (listing the "three basic components of a drug conspiracy").

Because Llinas does not contest the existence of a criminal conspiracy between Sanchez and Martínez,[4] we consider only whether the government proved beyond a reasonable doubt both that Llinas knew of the conspiracy and that she voluntarily participated in it.

It is clear from the record that Llinas engaged in activity that would be illegal had she known about the Sanchez-

---

[4]According to Llinas's brief, "[f]rom the testimony of undercover agent Carrasquillo[,] the government established that . . . [t]hey finally agreed to exchange 2 kilos of heroin to be delivered by Sanchez and [Martínez] in exchange for 11 kilos of cocaine to be delivered by agent Carrasquillo."

-9-

Martínez conspiracy. For example, Llinas testified that, on the day of the exchange, she picked up the boxed heroin from the backseat of the car and handed it to Martínez. This evidence alone arguably is sufficient to prove voluntary participation in the conspiracy, including an intent to commit the underlying substantive offense, if Llinas knew that drugs were in the box.

Llinas's conviction, then, turns on the question of when, if ever, she gained knowledge of the conspiracy. At trial, no direct evidence was presented on this issue; instead, as is permissible, the jury inferred knowledge from the government's circumstantial evidence. See Gomez-Pabon, 911 F.2d at 853 ("[P]roof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes." (citations omitted)); see also United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995) (noting that "the government's proof may lay entirely in circumstantial evidence" (citation omitted and emphasis retained)).

Although the evidence is not overwhelming, we conclude that the jury, having been properly instructed,[5] could have found that the evidence was sufficient to prove the requisite knowledge beyond a reasonable doubt. The inference that Llinas was, in fact,

_____

[5]The district court instructed the jury, inter alia, that "a person who has no knowledge of a conspiracy, but happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator."

-10-

a knowing participant in the conspiracy is adequately supported by substantial circumstantial evidence <u>together with</u> evidence that Llinas testified untruthfully at trial.

First, there was substantial circumstantial evidence suggesting that Llinas knew about the conspiracy. This evidence can be summarized as follows: While in Puerto Rico, Sanchez and Martínez stayed with Llinas in the same house; despite her testimony to the contrary,[6] Llinas drove Sanchez and Martínez to their initial meeting with Carrasquillo, waited in the car approximately one-half hour, and then drove them back to her stepfather's home; Llinas was present when Martínez phoned Carrasquillo and spoke about the drug exchange (albeit in coded language); on the day of the drug exchange, Martínez handed Llinas the telephone so that she could receive directions to the racetrack; Llinas agreed to provide the transportation to the racetrack in her boyfriend's rental car; after Llinas arrived at the racetrack, an undercover agent allegedly observed her "moving [her] head[] like looking for something";[7] when asked, Llinas

---

[6]Llinas's potentially untruthful testimony is discussed below.

[7]On cross-examination, however, the undercover agent suggested that he might not have actually observed Llinas "looking for something." After Arroyo's defense counsel established that the agent failed to note this particular observation in his investigative report, the following exchange occurred:

A: But you have got to remember that always, always in all these transactions, when they arrive in a vehicle, they all do the same. They are always looking around at everything, and I never write those details in a

-11-

handed Martínez the drugs, which had been hidden in boxes next to her in the backseat; and, following confiscation of the heroin that was placed in two Ericsson cellular telephone boxes, agents seized two Ericsson cellular telephones from the car.

Llinas responds to the government's evidence as follows:

> It is obvious that from the evidence taken as a whole . . . that [Martínez] used [Llinas] to provide him with transportation without [Llinas] having knowledge that he was engaged in narcotics trafficking with Daniel Sanchez. Whatever actions [Llinas] took in providing a ride to [Martínez] and Sanchez on June 16 and July 3, [they] were carried out without criminal knowledge and intent.

We are unconvinced. While "mere presence at the scene of the crime" or "mere association with conspirators" is not enough to establish guilt, see Gomez-Pabon, 911 F.2d at 853, "the mere presence defense is not so ubiquitous as to envelop every drug-trafficking case in which the government lacks direct evidence of a defendant's complicity." Echeverri, 982 F.2d at 678. See also United States v. Flores-Rivera, 56 F.3d 319, 324 (1st Cir. 1995) ("Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are relevant factors for the jury." (quoting United States v. Sanchez,

_____

[report].
Q: Well, sir, is that an assumption you are making because you thought that the people inside the car knew what was going on? . . .
A: Well, based on my experience, I know.
Q: Exactly. That's what you believe is the pattern of behavior. Is that correct . . . ?
A: Yeah, yeah.

-12-

961 F.2d 1169, 1174 (5th Cir. 1992)) (emphasis retained)). "As we repeatedly have recognized, a jury is free to rely on its common sense and may infer that criminal conspirators do not involve innocent persons at critical stages of a drug deal." United States v. DiMarzo, 80 F.3d 656, 661 (1st Cir. 1996) (citations omitted). "[S]uch is not normally the conduct that one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders." United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982).

Here, of course, Llinas was more than merely present. On at least one occasion, Llinas provided the necessary transportation. And, as the evidence shows, her usefulness extended much further than the car. First, Llinas alone had the directions to the racetrack; but for her guidance, it is likely that Martínez never would have arrived. Second, when asked, Llinas picked up the heroin that was next to her on the backseat and handed it to Martínez; that the drugs were concealed within boxes is, of course, not enough to require a finding of reasonable doubt as to knowledge, since the jury was entitled to infer knowledge from the other circumstantial evidence.

In addition to evidence of Llinas's affirmative involvement in the conspiracy, the government also presented evidence showing what Llinas did not do. For example, notwithstanding her testimony that she planned to drop Martínez off

-13-

at the racetrack and then leave for the beach, neither Llinas nor her boyfriend ever moved from their respective positions in the car to take Martínez's place in the driver's seat; instead, they remained at the racetrack and waited for Martínez. Having observed these nonevents on the videotape of the arrest and having heard unrebutted testimony that the heroin was to be exchanged for eleven kilograms of cocaine, the jury was free to infer that the more likely story was that Llinas and Martínez planned to leave the racetrack together, along with the cocaine for which they arrived in the first place.

On facts analogous to these, where the defendant-driver alleged not only that "he had merely given [a conspirator] a ride and [had] not participate[d] in the drug sale" but also that "there was no evidence that he could see what was in the box," we noted that "the jury could reasonably have inferred that under these potentially dangerous circumstances, an insider rather than an outsider would chauffeur the dealer." United States v. Olivo-Infante, 938 F.2d 1406, 1409 (1st Cir. 1991). So too in this case. See Echeverri, 982 F.2d at 678 ("[W]e require only that a jury's verdict be supportable, not that it be inevitable . . . .").

Llinas, however, argues that "the present case is akin to several appeals where this court has not hesitated to reverse convictions on sufficiency grounds where the government failed to establish that the actions taken by the defendant were made with

-14-

criminal knowledge and intent" (citing United States v. Francomano, 554 F.2d 483 (1st Cir. 1977); United States v. Mehtala, 578 F.2d 6 (1st Cir. 1978); United States v. Ocampo, 964 F.2d 80 (1st Cir. 1992); Valerio, 48 F.3d 58; United States v. de la Cruz-Paulino, 61 F.3d 986 (1st Cir. 1995); United States v. Clotida, 892 F.2d 1098 (1st Cir. 1989)).

These cases are inapposite because, unlike in this case, the factfinder did not have evidence suggesting that the defendant had lied on the witness stand. In Francomano, for example, we based our decision to vacate the conviction on findings that "the Government made no case-in-chief and no testimony offered by the [defendants] strengthen[ed] the Government's case." 554 F.2d at 487 (emphasis added). We noted that, while a jury may sometimes infer guilt from the mere fact that the defendant lied on the stand, "we [could] detect no inconsistencies or other appropriate basis for such an inference here." Id. at 487-88.

Here, even if we were to assume that the government's circumstantial evidence, taken alone, was insufficient to support an inference of knowledge, we cannot ignore the strong possibility that the jury determined that Llinas had lied on the witness stand. At trial, Llinas testified that she could not have driven Sanchez and Martínez to their meeting with Carrasquillo because she had been working on the day in question. Not only did the government present evidence in rebuttal suggesting that Llinas had not worked

that day, it had also presented Sanchez's testimony that Llinas had driven them to their meeting and Carrasquillo's corroborating testimony that a woman fitting Llinas's description had driven the car.

Having reason to doubt Llinas's credibility, the jury properly could have disregarded all of Llinas's testimony, including the beach-weekend explanation for her presence at the racetrack.  See United States v. Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991) (noting that "the district court's well-supported finding that appellant gave materially false testimony . . . provided a basis for discrediting other exculpatory testimony given by [appellant] in [her] own defense" (citations omitted)).

Moreover, the jury properly could have used Llinas's testimony, in conjunction with the government's circumstantial evidence, to bolster its inference of knowledge.  See United States v. Hadfield, 918 F.2d 987, 999 (1st Cir. 1990) (finding that an inference of guilt could have been further supported by defendant's "tall tale"); see also Ruiz, 105 F.3d 1492, 1500 ("Lies such as these legitimately support a finding of guilt."); United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) ("[I]f the jury disbelieved defendants' story, it could legitimately have presumed that the fabrication was all the more proof of their guilt." (citation omitted)).

-16-

In sum, having thoroughly examined the record, we conclude that the jury had sufficient evidence from which to draw an inference of knowledge.[8]

**(2) Facilitation Count**

Llinas next argues that "the evidence presented by the government was [in]sufficient to establish that [she] . . . knowingly and intentionally used a telephone facility to promote [the] conspiracy." She asserts that "the same analysis . . . as to the conspiracy count applies in the use of a telephone facility charge."

The applicable criminal statute, 21 U.S.C. § 843(b), makes it "unlawful for any person <u>knowingly</u> or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony . . . ." (emphasis added).

Because it is clear from the record that Llinas engaged in activity that would be illegal had she known about the Sanchez-

_____

[8]On the basis of the record before us, we have difficulty understanding the defense decision to provide unnecessary testimony regarding Llinas's whereabouts when such testimony easily could have been -- and was -- contradicted. The important issue in the case involved Llinas's knowledge (or lack thereof) -- not whether she was driving the car on June 16th (especially given the permissible inference that she simply was providing a ride to a house guest). But, Llinas has made no ineffective assistance of counsel claim on direct appeal and, in any event, the record is not sufficiently clear to allow us to consider it in the first instance (in part because the record is silent as to counsel's rationale). Any further elaboration of the issue must thus await a motion for relief under 28 U.S.C. § 2255.

Martínez conspiracy, see, e.g., United States v. Tuesta-Toro, 29 F.3d 771, 776 (1st Cir. 1994) (finding that two telephone calls between co-conspirators to arrange a drug deal was enough to prove facilitation); United States v. Cordero, 668 F.2d 32, 43 & n.16 (1st Cir. 1981)(rejecting defendant's two-pronged argument that, because she spoke only with a government agent and because she merely was receiving rather than placing the call, she could not have violated § 843(b)), Llinas's conviction again turns on whether she knew about the conspiracy. Having already addressed this issue, we need not provide further elaboration.

### B. Rule 12.1

Finally, Llinas argues that her convictions should be set aside because "the district court committed reversible error in permitting the government to present alibi rebuttal testimony and documents[, neither of] which were [] notified to appellant after she served her notice of alibi as requested by the government pursuant to Rule 12.1 of the Federal Rules of Criminal Procedure." We disagree.

When triggered, Rule 12.1 imposes disclosure obligations on both the defendant and the government. The applicable version of the rule provides, in pertinent part, as follows:[9]

---

[9]Rule 12.1 was amended in 2002; the changes were primarily stylistic. See Fed. R. Crim. P. 12.1, advisory committee's note (2002).

> (a) Upon written demand of the attorney for the government . . . [,] the defendant shall serve . . . upon the attorney for the government a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.
>
> (b) Within ten days thereafter, . . . the attorney for the government shall serve upon the defendant . . . a written notice stating the names and addresses of the . . . witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

Fed. R. Crim. P. 12.1 (2000) (amended 2002) (headings omitted).

Here, the government triggered Llinas's obligation under Rule 12.1(a) when it filed a motion requesting "notice of defendant's intention, if any, to offer the defense of alibi." On October 20, 2000, Llinas complied with this request by filing a "notice of alibi." According to her notice, Llinas planned to introduce evidence at trial establishing that, because she was working on June 16, 2000, she could not have driven Martínez and Sanchez to the bakery. Specifically, she intended to introduce a paycheck stub (which was attached to the notice) and testimony from a manager at the supermarket where she worked. Llinas herself was not listed as a witness.

Having fulfilled her obligation under Rule 12.1(a), the government had a reciprocal obligation under Rule 12.1(b) to

respond with a list of "witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses." Id. (emphasis added). The government did not file such a response. Whether one was required is, of course, the dispositive question.

At trial, Llinas herself testified that she had not driven Martínez and Sanchez to the bakery on the 16th -- a story that defense counsel attempted to corroborate by offering into evidence a paycheck stub that allegedly placed Llinas at work on the day in question. During a sidebar conference following these events, the government informed defense counsel that it had obtained payroll records from the supermarket that cast serious doubt on the validity of Llinas's testimony. Despite objection, the government was allowed to introduce these records as impeachment evidence through the testimony of the supermarket's accountant, who was called to authenticate the documents.[10]

_____

[10]The specific basis for the district court's ruling is embedded in the following exchange:

The Court: Why didn't you provide the name of this witness to counsel?

The Government: At the time defendant took the stand and decided to tell that she did work on the 16th of June, at that point the matter was triggered, so at this point in time, in open court and for the record, I told Brother Counsel and I showed him the – a photocopy of the books of [the supermarket]. And I immediately told my case agent, 'Go get this man, because I am going to impeach this witness.'

The Court: Well, [defense] counsel, the statement came out in open court from her, not from your [listed alibi] witness. You see? It probably could have been different

On appeal, Llinas contends that both the payroll records and the accountant's testimony should have been excluded because, had she been aware of the government's intention to introduce evidence indicating that she had not been at work on June 16th, she "very well could have determined that she was incorrect in thinking that she had worked [on] that particular day and [might have decided] not [to] present[] any alibi evidence at all."

At the outset, we note that, by its own terms, Rule 12.1 requires the disclosure of witnesses -- not documents.  See id.; see also United States v. Carrasquillo-Plaza, 873 F.2d 10, 12 (1st Cir. 1989) ("[T]he reciprocal duty imposed on the government is limited to the disclosure of the names and addresses of witnesses upon whom the government intends to rely . . . ." (emphases retained));  United States v. Jones, 255 F.3d 916, 918 (8th Cir. 2001) ("[Rule 12.1(b)] requires disclosure of the names and addresses of the government's rebuttal witnesses, not all its rebuttal evidence[;] [t]hus, Rule 12.1(b) does not apply to the document used to impeach [the witness]."). Accordingly, we reject

had you presented your alibi witness and then he – the Government might be prevented from bringing another witness because he didn't give that name to you.  But in this case, it is the defendant herself who said, 'Yes, I worked on the 16th.'  You presented a stub to try to show that she worked on that day, and I recall that I said, 'Well, this doesn't show the days she worked.  Merely in that pay period she earned whatever amount is there.' But it doesn't show days of work nor specific hours worked on specific days.  So the Government is entitled to rebut that evidence.

-21-

Llinas's argument that the district court erred in allowing the government to introduce the supermarket's payroll records.

The thornier issue is whether the accountant's testimony falls within the purview of Rule 12.1(b).  Given the content of Llinas's 12.1(a) notice, the government had no reason to know that it might need to rely upon the accountant's authenticating testimony.  After all, the witness that Llinas had noticed in her Rule 12.1(a) disclosure, the store manager, easily could have laid the foundation for –- and elaborated upon the implications of –- the payroll records on cross examination by the government.  In other words, it was not until unforeseen events had unfolded at trial –- in particular, Llinas's testimony and the introduction into evidence of the paycheck stub through _her_ testimony –- that the government had reason to know that the accountant would be needed as a rebuttal witness.  Whether or not this witness fell within the purview of Rule 12.1, under these circumstances the district court did not abuse its discretion in allowing the accountant to authenticate the payroll records.

### III.

For the reasons stated above, the convictions are **<u>affirmed</u>**.


**Concurring opinion follows.**

**BOUDIN**, **<u>Chief Judge</u>**, **with whom LIPEZ**, **<u>Circuit Judge</u>**, **joins (concurring**). This is an unusual case and a troubling one. But for Llinas' false testimony, this would be an instance in which the defendant's conduct was as consistent with innocence as with guilt. Assuredly, Llinas' actions were enough to constitute participation: she drove the car, got directions, handed over the drugs. But if she did not know that this was part of a drug transaction, she was not guilty of a crime. The evidence of knowledge is very thin.

Had the defense rested without putting on a case, any conviction that followed would have been reversed by the panel. Cf., e.g., <u>United States</u> v. <u>Corchado-Peralta</u>, 318 F.3d 255, 259-60 (1st Cir. 2003). The line between reasonable inference and speculation is very hard to draw; but up to the point when Llinas took the stand, there was little to distinguish her from her boyfriend, whom the jury properly acquitted. She had apparently been seen on a prior occasion waiting for Martínez, but this was consistent with the fact that he was also a guest of her father and added little to the government's evidence of knowledge.

Admittedly, the government's direct case against Llinas went slightly beyond "mere presence." Llinas was present during the coded-language telephone conversation between Martínez and the undercover agent that is described in the panel opinion, and her subservience to Martínez at the racetrack was mildly suspicious.

Yet Llinas could well not have known that she was driving Martínez to a drug transaction, and the sum is remarkably slim evidence for sending this young woman to federal prison for more than ten years. (The principal culprits got four and seven years, respectively).

Nevertheless, when Llinas took the stand and then lied (or so the jury could have found), she gave the jury the extra evidence it needed and the conviction was not irrational. Of course, her denial of presence at a secondary event could have been the product of pure fear or misrecollection, but the jury is permitted to draw an inference of guilt from a deliberate false alibi. See, e.g., United States v. Hadfield, 918 F.2d 987, 999 (1st Cir. 1990), cert. denied, 500 U.S. 936 (1991). Added to the faintly suspicious circumstances, a jury could rationally convict, although this stretches "beyond a reasonable doubt" to its limits. Federal drug cases in which strong doubts as to guilt linger on appeal are a rarity.

Llinas unquestionably has a potential claim under section 2255 that she has been deprived of competent representation. 28 U.S.C. § 2255 (2000). This is not because of counsel's decision to go forward with an affirmative defense case once the Rule 29 motion had been denied; given the denial, it was a reasonable choice to offer a defense even at the cost of waiving the right to appeal the denial as measured by the government's case alone. Rather, the potential claim of incompetence relates to the decision to allow

Llinas to testify and provide an alibi that could, as it turned out, be so easily undermined by available company records.

The error was surely prejudicial under the governing Strickland test.  See Strickland v. Washington, 466 U.S. 668, 687-88 & 694 (1984).  Indeed, without the false alibi, Llinas' conviction could not properly be sustained.  But background circumstances could provide some explanation for counsel's action: perhaps Llinas insisted on testifying despite counsel's warning or perhaps the fact that the alibi could so easily be undermined would not have been apparent to a lawyer making a reasonable investigation.  It is because of such uncertainties that here, as in the ordinary case, the competence issue cannot be resolved on direct appeal.  See, e.g., United States v. Padilla-Galarza, 351 F.3d 594, 600-01 (1st Cir. 2003).

If and when Llinas does file a section 2255 motion, it should be given expeditious treatment, and able counsel should be appointed to represent Llinas.  18 U.S.C. 3006A(a)(2)(B) (2000).  Why this case was brought against Llinas remains a mystery.  The government had no reason to expect the windfall of Llinas' apparently false testimony and, on the evidence presented for its direct case, no prosecutor should have foreseen a reasonable likelihood of a legitimate conviction.  As for the decision to prosecute the boyfriend, the mind reels in disbelief.