# United States Court of Appeals

## For the First Circuit

No. 03-2062

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN J. DONATO-MORALES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Joseph A. DiClerico, Jr.,* U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Harry Anduze-Montaño for appellant.

Vernon Benét Miles, Assistant United States Attorney, with
whom H.S. García, United States Attorney, and Sonia I. Torres-
Pabón, Assistant United States Attorney, Chief, Criminal Division,
were on brief, for appellee.

September 2, 2004

---

\* Of the District of New Hampshire, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>. After a bench trial, Juan Donato-Morales, then a United States Marshal, was convicted of larceny from the United States, 18 U.S.C. § 641, for shoplifting a videocassette recorder (VCR) at the Fort Buchanan Army and Air Force Exchange Service (AAFES) in Puerto Rico. The government introduced in evidence a surveillance video that showed Donato, sequentially, taking one VCR out of its box and placing it on the shelf, while placing the empty box on the floor. He then took a second and different VCR out of its box, placed it into the box of the first VCR, and put the second box back on the shelf. He then took the first VCR's box with the second VCR in it to the checkout and paid for it. In doing so he paid $99, the sale price on a $129 Mitsubishi HS-U445 VCR ("445"), while receiving a $189 Mitsubishi HS-U746 VCR ("746"). After he paid and as he attempted to leave the store, he was intercepted and questioned. His answers were not consistent with the surveillance video. He was ultimately charged and convicted.

Donato challenges his conviction on sufficiency of evidence grounds, both overall sufficiency and sufficiency as to intent. Section 641 requires, inter alia, that the defendant had specific intent to steal a "thing of value." <u>See</u> <u>id.</u>; <u>Morissette</u> v. <u>United States</u>, 342 U.S. 246 (1952). The question of intent is a question of fact for the trier of fact. <u>Id.</u> at 274. Donato argues that the government has not demonstrated beyond a reasonable

doubt that he knew the 445 VCR cost less than the 746 VCR and, hence, that he had specific intent to steal a "thing of value." The price of the 746 VCR was not marked on the box, and the government submitted no evidence that the price for that model was displayed anywhere else. However, the original price and sale price of the 445 VCR were marked on its box. Donato also argues to us,[1] as he did to the trier of fact, that as a U.S. Marshal he knew there was a surveillance camera at the store, and that as a result the evidence should be interpreted to mean he lacked the intent required because he would not have shoplifted with a surveillance camera operating.

We reject Donato's arguments. On the basis of the video, which shows a purposeful transfer of the more expensive VCR to a box that contained the less expensive VCR, and on the basis of Donato's subsequent statements to the AAFES security officer, to the military police, and in his trial testimony, which are inconsistent with the video and the testimony of other witnesses, we cannot say a reasonable factfinder could not conclude beyond a

---

[1] For example, in his initial brief, Donato stated:

Appellant spent eighteen (18) years of his life as a distinguished member of the United States Marshal Office, occupying there various positions of great responsibility. Around the time of the incident that brings forth this case, Mr. Donato earned approximately one hundred thousand dollars ($100,000) a year.

reasonable doubt that Donato switched the VCRs with the intent to steal something of value.  Accordingly, we affirm.

**I.**

On January 4, 2003, Donato went to the AAFES to buy a VCR.  He testified that he needed a VCR with an S-video input, so that he could transfer his daughter's wedding video from his brother's video camera onto tape.  S-video is a technology for transferring video images between video cameras, game consoles, televisions, computer monitors, and the like; when images are to be displayed on a television screen, those transferred using S-video will be sharper.  See Webopedia, Definition of S-video, at http://www.webopedia.com/TERM/S/S_Video.html.

Mark Montalvo, a store employee, testified that, at a time before the events shown in the surveillance video, he opened a box containing a Mitsubishi VCR for Donato and showed Donato the S-video input jack in the back of the VCR.  Donato, Montalvo testified, seemed "pleased" with what he saw, and their conversation ended.  Although Montalvo could not remember the precise model number of the Mitsubishi VCR he showed Donato, he identified it as the one that Donato ultimately selected, i.e., the 746.  Montalvo further testified that he had said "[n]othing" to Donato concerning the opening of boxes and that store policy required a sales associate to be present when customers opened merchandise.

-4-

Donato's testimony contradicted Montalvo's. Donato denied that Montalvo showed him a VCR with an S-video input and also claimed that Montalvo gave him permission to open VCR boxes on his own to check for S-video inputs.

After speaking to Montalvo, Donato continued shopping and put a different VCR, a Sony N88 that Montalvo testified cost approximately $99, in his shopping cart. Donato's next moves were captured on surveillance video. Donato removed a Mitsubishi HS-U445 VCR, which did not have an S-video input, from its box and packaging, inspected it, and left the VCR unit on the display shelf. The 445 box (which was admitted in evidence) had both a $129 price sticker and a $99 price sticker on it. Donato put the 445 VCR box, with the foam packaging still inside, on the floor, leaving the VCR itself on the shelf. Donato then pulled the Mitsubishi HS-U746 VCR box from the bottom shelf and placed it onto the floor just next to the 445 box; he then sliced opened the 746 box. The 746 VCR, which cost $189,[2] did not have a price sticker on it. At this point, the 746 and 445 VCR boxes were next to each other; the 445 box had only foam packaging inside and the 746 box

---

[2]    Donato argues that the government violated the best evidence rule, Fed. R. Evid. 1002, by relying on the security officer's testimony of the price rather than a written printout from the scanner that the officer used to determine the price. The district court correctly rejected this objection at trial. The best evidence rule applies only to evidence submitted to prove the content of writings, recordings, or photographs. The officer's testimony was not offered to prove the content of the scanner display, but rather the price of the VCR.

still had its VCR in it.  Donato paused for several seconds, looking back and forth between the two boxes, and then removed the foam packaging from the 445 box, leaving it completely empty.

Donato next removed the 746 VCR from its box with its foam packaging and wrapper intact.  The wrapper, which was semi-opaque, covered the entire VCR.  At no point did Donato remove the wrapper to examine the VCR or attempt to look at the VCR through the wrapper.  Instead, Donato briefly examined the cover of the 746 manual.  That cover did not expressly indicate that the VCR had an S-video input.[3]  Donato also examined a plastic bag with the cables and controls of the 746 for approximately three seconds.  The controls of the 445 and 746 look identical, as do three of the four cables included with each VCR.  The end of the black cable for the 746, though, is slightly different from its counterpart in the 445: the end of the 746 cable is about half a centimeter longer and has more pins inside it.  Donato then put the 746 VCR, still unexamined and intact in its foam packaging and wrapper, into the 445 box, picked up that box, and put it into his shopping cart.  The entire process of switching the two VCRs was completed in just over three minutes.

Donato then gathered up the foam packaging, manual, controls, and cables for the 445 VCR, put them in the 746 box, and

_____

[3]    The manual cover did have an SVHS symbol in one corner, but that symbol did not provide any new information, as it was also displayed prominently on the outside of the 746 box.

returned that box to the shelf.  He put the Sony VCR that had been in his shopping cart on the shelf as well and began pushing his cart down the aisle.

The 445 VCR box, with the 746 VCR inside it, was sitting open in his shopping cart with the 746 manual lying face-up on top. "Model HS-U746" is printed in approximately 30 point font in the center of the 746 manual cover.  When Donato first opened the 746 box, the manual had been lying flat on top.  Montalvo confirmed in his trial testimony that this is the typical placement of the manual in most VCRs.  In the video, Donato is shown folding the 746 manual and stuffing it down the side of the box, where its cover was no longer visible, before leaving the area.  At trial, in contradiction to the video, Donato denied that he had stuck the manual down the side of the box and insisted that the manual had been in "plain view on top of the VCR."

Once outside the aisle, Donato is shown speaking for two or three seconds to Mark Montalvo.  Donato testified that he asked Montalvo if it was a problem that the box was open, and that Montalvo closed the box and said that it was not a problem because the cashier at the checkout counter was "going to check the box anyway."  Donato is then shown pushing the cart away, pressing on the top of the box to keep it closed.

After wandering around the store for another ten minutes and picking up some other items, Donato proceeded to check out at

the jewelry counter. At no point in the video did Donato place the VCR on the checkout counter or otherwise hand it to the cashier. During the entire checkout process, he kept the VCR in the shopping cart, and until he signed the credit card receipt, he kept his arm draped over the top of the box, holding it closed. Donato ultimately paid $99 for the VCR. He testified that the cashier told him that the VCR was discounted by $30 from its $129 price, but that he had not been aware of the discount until then. On cross-examination, Donato said that he had "turned the box around" so the cashier could "look[] at the price." The surveillance video shows that when Donato first approached the checkout counter, the $129 price faced the cashier, but he later turned the box so that the side with the $99 price faced the cashier instead.

Donato was apprehended at the exit by AAFES security officer Nelson Colon, who had been observing Donato on the surveillance video. Colon asked for Donato's identification and his receipt. Donato showed his Marshal's identification and the receipt; the two then went to a small security office. Colon testified that when he confronted Donato about the fact that Donato had switched the VCRs and that the wrong VCR was in the box, Donato "said it was probably a mistake." Colon further testified that he "asked [Donato] if he had a chance to switch the VCRs and the boxes" and that Donato said "no." The video shows that this was plainly untrue. Donato confirmed in his trial testimony that after

Colon confronted him, he told Colon, "That was a bit of a mistake. It has to be a mistake because what I came here for is looking to buy a VCR that has to be with S video."

Donato was later interviewed by Ricardo Seija, a military police officer. Seija testified that when he informed Donato that Donato was suspected of shoplifting, Donato showed surprise and "said he didn't know what it was about." Donato confirmed at trial that when Seija told him that he was going to be given a citation for shoplifting, Donato said, "[W]hat? Shoplifting what? What do you mean?" Donato testified, "I told him, listen, that must have been a mistake."

On March 12, 2003, the government charged Donato with federal larceny under 18 U.S.C. § 641. A bench trial was held on April 1, 2003. Donato moved under Fed. R. Crim. P. 29 for a judgment of acquittal at the close of the government's case, arguing that no specific intent had been shown. The court denied the motion. Donato then testified in his own defense. On cross-examination, he stated, "I didn't realize that [I had switched the VCRs] until I saw that in the video." He repeated, "I didn't realize I made a mistake." At the close of all evidence, Donato renewed his Rule 29 motion, which the court again denied.

Two days later, the court found Donato guilty. At Donato's sentencing hearing on June 17, 2003, the court noted for the record that "Mr. Donato's testimony concerning the material

events that occurred on January 4th, 2003, the date of the event was not credible."  The court required Donato to pay a $1000 fine and a $25 special monetary assessment.

Donato timely appealed, challenging the sufficiency of evidence supporting his conviction.

**II**.

Donato's claims of insufficiency of the evidence as a whole and insufficiency on the issue of intent are reviewed de novo.  We must affirm if "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Grace, 367 F.3d 29, 34 (1st Cir. 2004) (quoting United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004)).  All credibility assessments must be resolved in favor of the verdict.  Id.  This same deferential standard of appellate review applies to the issue of intent, which is an issue of fact.

Donato argues more specifically that the evidence at trial was not sufficient to support a finding of specific intent. The statute under which Donato was convicted, 18 U.S.C. § 641, provides that:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any

department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both . . . .

Although § 641 does not expressly require specific intent, the Supreme Court has held that Congress, in codifying the common law crimes described in § 641, intended to incorporate the common law requirement of specific intent as an element of the crime. Morissette, 342 U.S. at 270-73.

The evidence here was sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that Donato had specific intent to "steal . . . a thing of value" from the United States. Direct evidence of specific intent is seldom available, United States v. Desmarais, 938 F.2d 347, 352 (1st Cir. 1991), and this case is no exception. But specific intent, like any other element,[4] can be established through circumstantial evidence. United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995); United States v. Olbres, 61 F.3d 967, 971 (1st Cir. 1995). We conclude that it has been here.[5]

---

[4] For example, in drug conspiracy cases, inferences are commonly drawn from circumstantial evidence as to the elements of conspiracy, including intent. See, e.g., United States v. Llinas, 373 F.3d 26, 30 (1st Cir. 2004); United States v. Morales-Madera, 352 F.3d 1, 12 (1st Cir. 2003); United States v. Akinola, 985 F.2d 1105, 1109 (1st Cir. 2003); United States v. Clifford; 979 F.2d 896, 898 (1st Cir. 1992); United States v. Gomez-Pabon et al., 911 F.2d 847, 853 (1st Cir. 1990).

[5] In disagreeing with this conclusion, the dissent cites to Conley v. United States, 323 F.3d 7 (1st Cir. 2003) (en banc). But Conley remanded on the issue of evidence said to be wrongfully withheld, and not on the issue of the sufficiency of the evidence.

-11-

From viewing the video, the district court could easily infer that Donato deliberately swapped the VCRs and that the video is inconsistent with Donato's claim of innocence. In addition to a visual depiction of Donato's deliberate movements, it is reasonable to conclude that there was no reason for Donato to remove the foam packaging from one empty box (which was the 445 box), other than to make room for the VCR taken from the other box (which was the 746 VCR). At that point, Donato had already taken the first VCR (the 445 VCR) out of its box, checked the back for an S-video input, and set it aside on the shelf. This inference is reinforced by the fact that, immediately before Donato removed the foam, he is shown on the surveillance video looking back and forth between the empty 445 box and the 746 VCR in its open box.

A rational factfinder could also conclude that Donato opened the 746 box in order to make the switch, not to check for an S-video input. Montalvo testified that he already showed Donato the 746 and its S-video input. Although Donato's testimony is to the contrary, the trier of fact could reasonably credit the testimony of Montalvo, who had no reason to lie, over that of Donato, who had much at stake and who the trial judge found was not a credible witness. The conclusion that Donato already knew the 746 had an S-video input is reinforced by the fact that he neither checked the back of the 746 VCR for an S-video input nor took the

It is simply not pertinent here.

-12-

VCR out of its foam packaging and semi-opaque wrapper.  At trial, Donato testified that he did not need to look at the VCR because he knew it had an S-video input based on the cables in the 746 box. But if Donato could tell whether a VCR had an S-video input merely by looking at the small differences in one of the four cables, there would be no need to remove either the 445 or 746 VCRs from their boxes.  Donato could simply have taken out the cables, which were in a bag separate from the VCR, and examined them.[6]  In short, a reasonable factfinder viewing the video could conclude there was no mistake.  Donato intended to switch the two VCRs.

The conclusion that the switch was deliberate is further supported by what the court could have reasonably viewed as Donato's attempt to cover up the switch.  See United States v. Llinas, 373 F.3d 26, 32-33 (1st Cir. 2004) (jury could reasonably find that the defendant lied and rely on that finding, in combination with other circumstantial evidence, to support an inference of criminal knowledge and intent); United States v.

---

[6]     Moreover, the video shows that Donato did not appear to examine the cables very closely.  Donato, who testified that he had no special knowledge of VCRs beyond what his brother told him about making sure the VCR had an S-video jack in the back, looked at the cables for only about three seconds at arm's length.  The only differences between the cables are that (1) the end of one of the four cables in the 746 is about half a centimeter longer than its 445 counterpart, and (2) the end of that 746 cable has more pins than its 445 counterpart.  The video shows that Donato never performed a side-by-side comparison of the 746 and 445 cables and never looked inside the ends to check the number of pins.

Hadfield, 918 F.2d 987, 999 (1st Cir. 1990) (defendant's attempt to cover up by telling a "tall tale" supports inference of guilt).

Donato is shown in the surveillance video stuffing the 746 manual, which stated the model number in large letters, and would thus give away that he had the wrong VCR in the 445 box, down the side of the box, where it would no longer be visible. Donato is also shown during checkout with his arm draped over the box, holding it closed, even though he testified that store associate Mark Montalvo had earlier informed him that the cashier was supposed to check the opened box. Moreover, according to the uncontroverted testimony of AAFES security officer Nelson Colon, Donato told Colon that he did not have a "chance to switch the VCRs," a statement that was plainly false.

In addition, a rational factfinder could conclude that Donato repeatedly lied in his trial testimony. Donato testified that the 746 manual was at the top of the box in plain view when he left the aisle and that he had not stuck it down the side of the box, a statement flatly contradicted by the surveillance footage. Donato testified that Montalvo had not shown him a VCR with an S-video input and that Montalvo gave him permission to open VCR boxes on his own. Montalvo contradicted both statements in his trial testimony. The court could reasonably find that Montalvo was telling the truth and Donato was lying. Also, Donato testified that he had not seen a price tag on the box he took to the cash

register, when the video shows him turning the box at checkout so that the cashier could see the $99 price tag, rather than the $129 price tag. Indeed, at sentencing, the trial judge said that as a trier of fact he found Donato's testimony was not credible. "Credibility determinations by the trier of fact are accorded special deference." United States v. Bouthot, 878 F.2d 1506, 1514 n.8 (1st Cir. 1989).

This court has repeatedly noted that a defendant's materially false testimony can be powerful evidence of criminal intent, at least when supported by other circumstantial evidence. Llinas, 373 F.3d at 33 (collecting cases). Here, given the strong evidence showing that the switch of the VCRs was deliberate, a rational factfinder could conclude that Donato lied to the AAFES security officer, again to the military police officer, and again to the trial judge when he claimed that the switch was a "mistake." A factfinder could further conclude that Donato lied again when he told the AAFES security officer that he had not had a chance to switch the VCRs and then repeatedly perjured himself in his trial testimony.

It is easy to infer from the evidence that Donato knew to a high degree of probability he was taking something of value belonging to the government. He did so by getting the benefit of a more expensive VCR for the less expensive price of the model 445 (or by getting a non-sale item at a sale price to the detriment to

the government, or both).  At a minimum, defendant knew his actions

were highly probably to result in taking something of value, as

indeed happened.  This standard is set forth in the Model Penal

Code at § 2.02(7) ("Requirement of Knowledge Satisfied by Knowledge

of High Probability: When knowledge of the existence of a

particular fact is an element of an offense, such knowledge is

established if a person is aware of a high probability of its

existence, unless he actually believes[7] that it does not exist.").

This standard has been adopted by the Supreme Court (and by other

circuits) in analogous cases.  See United States v. Aguilar, 515

U.S. 593, 599 (1995) (specific intent to obstruct justice is shown

when the defendant knows his actions are "likely" to affect the

outcome of the judicial proceeding)[8]; Turner v. United States, 396

---

[7]    The evidence is inconsistent with a theory that Donato
actually believed that there was no price differential.  Nor did he
assert that defense; his defense was mistake.

[8]    The dissent, citing Morissette v. United States, 342 U.S.
246 (1952) contends that, unlike § 641, Aguilar "involves
obstruction of justice in a statutory context not controlled by
longstanding common law jurisprudence."  This premise is mistaken.
Aguilar itself looks to Pettibone v. United States, 148 U.S. 97
(1893), in order to construe the intent requirement for obstruction
of justice.  Pettibone notes that, like § 641, the federal
obstruction of justice statute is rooted in the common law of
conspiracy, and as a result requires knowledge of all material
facts.  Id. at 203.  Morissette, when making the distinction
between statutes rooted in the common law and "offense[s] new to
general law," was referring to the rising class of "regulatory"
crimes, for which dispensing with a knowledge requirement would be
possible.  Morissette, 342 U.S. at 248-49.  Obstruction of justice
is not such a crime, nor did the Supreme Court treat it as such in
Aguilar.  The dissent's argument also fails to account for Turner
and Leary.

-16-

U.S. 398, 416 (1970) (Saying, in drug importation case: "There is no proof that [defendant] had specific knowledge of who smuggled his heroin or when or how the smuggling was done, but we are confident he was aware of the 'high probability' that the heroin in his possession had originated in a foreign country."); Leary v. United States, 395 U.S. 6, 46 n. 93 (employing Model Penal Code § 2.02(7) definition of knowledge as to "knowing" requirement of 21 U.S.C. § 176(a)); United States v. Caminos, 770 F.2d 361, 365 (3d. Cir. 1985) (in drug importation and possession case, knowledge requirement satisfied where "defendant himself was subjectively aware of the high probability of the fact in question"). See also United States v. Honeycutt, 8 F.3d 785, 787 (11th Cir. 1993) (citing above Supreme Court cases with approval and adopting Model Penal Code definition of knowledge as to "knowing" requirement of § 2K1.4(a) of the Sentencing Guidelines); United States v. Karlic, 997 F.2d 564, 569 (9th Cir. 1993) (same). Further, this court has mentioned Model Penal Code § 2.02(7) with approval when adopting the Model Penal Code's "knowing" definition in other contexts. See United States v. Ruiz, 105 F.3d 1492, 1507 & n.16 (1st Cir. 1997); United States v. DiSanto, 86 F.3d 1238, 1257 & n.29 (1st Cir. 1996). Here the evidence, while not direct, was strong, and certainly adequate to support the verdict. A rational trier of fact could have found the essential elements of a case beyond a

reasonable doubt.  <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 319 (1979).
We **affirm** the conviction.


**Dissenting Opinion Follows.**

**TORRUELLA**, **Circuit Judge** **(Dissenting)**. Like anyone charged with a crime, appellant is entitled to put the government to the test to prove each and every element of the crime alleged by proof beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361-62 (1970)(this requirement "dates at least from our early years as a Nation"). Because I am firmly convinced that the government has failed to meet this burden by failing to prove that appellant had the specific intent to steal a "thing of value" from the United States, as required by Morissette v. United States, 342 U.S. 246 (1952), I respectfully dissent.

The house of cards upon which the government bases its case is anchored on the theory that appellant intended to steal something of value because he switched the contents of two VCR boxes, in order to pay less for certain merchandise displayed at the Camp Buchanan PX than this merchandise was worth.[1] Crucially, the government has failed to establish criminal intent because there is no proof, direct or circumstantial that prior to his being stopped by security personnel as he left the store, appellant was aware of the difference in price between the two VCRs in question, Models 445 and 746. The uncontradicted evidence is that: (1) only

---

[1] Although the amount paid by appellant for the merchandise in question was only $99, the price tag actually on the VCR's box was for $129. The evidence does not show that appellant learned of the lower price before he paid for the VCR at the cash register and was informed by the cashier that this VCR was on sale at the lower price.

the lower priced model (445) had a price tag, (2) the video introduced in evidence clearly shows that the place for the price on the 746 was blank, (3) the two models were next to each other on contiguous shelves without different pricing being displayed in the shelving (or for that matter, _anywhere_ in the store) apprising prospective buyers of a difference in price, (4) the boxes on both models are practically indistinguishable, and (5) the two VCR models are also indistinguishable except for the end of the connecting cable in the 746 model, which is "about half a centimeter longer and has more pins inside it" than in the 445. _Maj. op._ at 6.

With this record, it is impossible to supply the missing indispensable link establishing proof of appellant's intent to pay less. Less than what? Unless it was clearly apparent to the appellant, _at the time of the exchange_, that there was a difference in value and thus that appellant was taking "something of value," the proof of the appellant's criminal intent is missing. This proof cannot be supplied after the fact as has been done here. Appellant's alleged lack of credibility does not supply the missing element, as it cannot be claimed that he was lying about the price of the merchandise or any other matter establishing the price difference. Neither can one extract circumstantial evidence of guilt from appellant's demeanor in switching boxes which were practically identical and showed no price difference.

What we have here is a situation similar to one in which both VCR models are in fact equally priced. Clearly appellant could not be convicted of taking something of value from the United States under those circumstances. The government thus was required to show that, at the time of the alleged taking, appellant was aware that the merchandise had different prices. This has not happened.

The flaw in the majority's reasoning, and thus in its faulty conclusion, is highlighted when it states that "Donato <u>knew to a high degree of probability</u> he was taking <u>something of value</u> [because he was] getting the benefit of a <u>more expensive</u> VCR for the <u>less expensive price</u> of the model 445 (or by getting a <u>non-sale item</u> at a sale price to the detriment to the government, or both)". <u>Maj. op.</u> at 15 (emphasis supplied). There is no basis in the record for these assumptions which are key to finding appellant guilty. There is no evidence that appellant knew, or could have known, that one VCR was more expensive than the other.

The majority's conclusions are based on unsound assumptions and are in stark contrast with <u>Conley</u> v. <u>United States</u>, 323 F.3d 7 (1st Cir. 2003)(en banc), a case in which after a jury conviction of a Boston policeman for perjury, twice affirmed and certiorari denied, this court on the third appeal stated in remanding for alleged <u>Brady</u> violations, "[t]he government's evidence at trial was adequate for conviction, but it was always

-21-

circumstantial . . . ." <u>Id.</u> at 16. The evidence of price difference in this case is not even circumstantial and much less adequate and thus the conviction should be reversed. This house of cards should fall of its own weight.

I respectfully dissent.